Salvatore DiMARCO, Petitioner,

v.

LaMoyne GREENE, Superintendent, Marion Correctional Institution, et al.,
Respondent.

No. C 65–231.

United States District Court
N. D. Ohio, W. D.

June 17, 1966.

James R. Willis, Cleveland, Ohio, Court-appointed counsel, for petitioner.

Leo J. Conway, Asst. Atty. Gen., Columbus, Ohio, for respondent.

## DON J. YOUNG, District Judge.

This is a petition for a writ of habeas corpus to secure the petitioner's release from the Marion Correctional Institution.

On October 2, 1963, petitioner was sentenced by the Court of Common Pleas of Cuyahoga County, Ohio, to serve a term of one to five years in the Ohio Penitentiary, after he was found guilty by a jury upon a charge of possession of burglar tools.

Previously, on January third, 1955, petitioner was convicted of burglary and safe tampering, and armed robbery and carrying concealed weapons, and sentenced to ten to twenty-five years in the Ohio Reformatory. He was confined therein, released on parole, returned as a parole violator, and again confined until January 11, 1962, when he was again released on parole. He was on parole on February 22, 1963, when the events happened which led to the sentence imposed on October 2, 1963.

On October 25, 1963, the Ohio Pardon and Parole Commission, finding that petitioner was confined in the Ohio Penitentiary, declared him a parole violator.

The conviction and sentence of October 2, 1963, arose out of the following circumstances:

Between one and two o'clock in the morning of February 22, 1963, a bitterly cold and wintry morning, a group of police officers were watching the automobile of a man named Walch, which was parked outside a tavern in the Collingwood area of Cleveland. The record of petitioner's trial showed that the man Walch was regarded by the police as a "hoodlum", and that it was the practice of the police to arrest and incarcerate "hoodlums" periodically, in the hope that after the arrest it would be possible to establish that the "hoodlums" had committed some crime which was discovered about the time of their arrest. (R. 43) If no such crime or connection appeared, the "hoodlums" would be released in a day or so. (R. 44)

While watching Walch's car, a small automobile drove up and stopped in front of it. A man named Frank DiSanto got out of the car, leaving the lights on and the motor running, and went into a tavern. DiSanto was known to the police, having been imprisoned some ten years previously on a felony charge. The police also observed the petitioner in the car, and recognized him.

They proceeded to the car, opened the door, told petitioner they were arresting him for violation of parole, and proceeded to search the car. Two crowbars, a large screwdriver, and a pair of vise-grip pliers were found in the car. An electric drill and an extension cord were found in the luggage carrier. Some considerable time later, a loaded pistol was found under the front seat of the car by an attendant in a storage garage, who reported this fact to the police. All of these articles were admitted in evidence over petitioner's objection.

Petitioner denied any knowledge of the articles in the car. His story was that he had come to the area from his home on the other side of the city to collect money due him for some work he had done; that the man who paid him had first agreed to drive him home, and then said he could not; that Frank DiSanto, with whom he had a slight acquaintance, was standing nearby, and offered to borrow a car to drive petitioner home; that DiSanto did borrow the car, started to

drive him home, and had stopped to get some cigarettes, which he was in the process of doing when the police approached.

The record showed that DiSanto, aware of the local police customs, and not desiring to be incarcerated or to cause trouble for the petitioner, took to his heels through the rear door of the tavern when he saw the police coming.

At the trial of the case, the petitioner moved for the suppression as evidence of the articles found in the car on the ground that they were the product of an illegal search. After a full hearing, the Court of Common Pleas overruled this motion, setting forth its reasons in considerable detail. Exceptions were properly preserved to the court's ruling, but it was affirmed on appeal to the Court of Appeals, and the Supreme Court of Ohio dismissed petitioner's appeal to that court.

It is fair to say that the constitutional questions involved in this matter have been presented to and determined by the state courts. For all practical purposes, the petitioner has exhausted his state remedies.

■ The first question to be resolved in this matter is whether this Court is required to grant petitioner a plenary hearing upon his petition for a writ of habeas corpus.

The decision of the Supreme Court in Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) governs the determination of this question. Under the rules laid down in that case, it is clear that no plenary hearing is required. The facts concerning the obtaining of the evidence which petitioner sought to suppress are almost entirely undisputed. The difficulty seems to have occurred in the ruling of the state court upon these facts.

The trial court says

" * * * but there does not have to be an arrest where the circumstances and the facts are sufficiently clear to police officers in the community who have a particular job to watch known places where they suspect or believe, as a prudent police officer would expect to, that elements of the type engaged in crime are congregating, and considering all of the circumstances involved, they had a right and a reasonable right to examine the automobile, which they did as they opened up the door." (R. 193)

The Supreme Court has held that "[a]lthough the district judge may, where the state court has reliably found the relevant facts, defer to the state court's findings of fact, he may not defer to its findings of law." Townsend v. Sain, 372 U.S. 293, 318, 83 S.Ct. 745, 760 (1963). With all respect to the judge of the state court, my old friend and classmate, I cannot accept his conclusions of law. It is fair to say that the law on this point was perhaps not so clear at the time of the hearing in the state court as it is now, Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964) and Beck v. State of Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) having been decided since the state court's ruling. In any event, the dispute here is so clearly one of law, rather than of fact, that no plenary hearing is required. The petitioner's rights can be determined upon the record of the proceedings in the state court, which are before this Court in a complete transcript of the trial.

The first main issue which must be considered in this matter is whether the denial of petitioner's motion to suppress the evidence of the various objects found in the automobile in which he was riding deprived him of his constitutional right to be secure from unreasonable searches and seizures.

The respondent contends that the search of the car in which petitioner was seated was in connection with a lawful arrest of the petitioner, and was therefore not within the constitutional interdiction of unreasonable searches and seizures. Thus the first main issue breaks down into two questions, first, was the arrest of the petitioner lawful, and, sec-

ond, was the search and seizure incidental to the arrest.

Considering these matters in reverse order, it is the conclusion of this Court that even if it be conceded that the arrest of the petitioner was lawful, the search was not a proper incident to it.

■ The general rule is that "a search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success." United States v. DiRe, 332 U.S. 581, 595, 68 S.Ct. 222, 229, 92 L.Ed. 210 (1948).

■ It is very clear from the decisions of the Supreme Court that the right to make a search without a warrant, contemporaneously with an arrest, is limited to a search for weapons, or for the fruits of, or implements used to commit, the crime for which the arrest is made. Weeks v. United States, 232 U.S. 383, 392, 34 S.Ct. 341, 58 L.Ed. 652 (1914); Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145 (1925).

■■ Bearing in mind that the undisputed evidence here was that the petitioner's arrest was solely for violation of parole, in that he was out after midnight, with a person with a criminal record, it follows that the only things that could lawfully be seized would be "things connected with the crime as its fruits or as the means by which it was committed, as well as weapons and other things to effect an escape from custody * * *." Ibid. What are the fruits of the crime of violation of parole? By what means was that crime, in the present instance, committed? Certainly not crowbars and electric drills. The weapon was not found until long after petitioner was incarcerated and the automobile was secured from removal or tampering. No conceivable justification for its admission can be found. Preston v. United States, 376 U.S. 364, 368, 84 S.Ct. 881 (1964). It is impossible to imagine that admission of the weapon into evidence was not extremely prejudicial to the petitioner.

In the case of Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), the defendant was suspected of complicity in the theft of whiskey. Officers observed him loading packages into an automobile. The automobile was stopped and he was arrested. The packages in the car were found to contain stolen radios. He was then charged in connection with the theft of the radios. The Supreme Court held that the evidence should have been suppressed. Surely there is a closer connection between stolen whiskey and stolen radios than between a violation of parole for being out late with improper companions and the possession of burglar tools.

This case seems to come clearly within the rule of Beck v. State of Ohio, 379 U.S. 89, 85 S.Ct. 223 (1964), but is an even stronger case, for in *Beck* the evidence uncovered was at least related to the suspicion which brought about the arrest, while here there was no connection whatsoever. This case, far more than *Beck,* justifies the Supreme Court's criticism of "the far less reliable procedure of an after-the-event justification for the arrest or search, too likely to be subtly influenced by the familiar shortcomings of hindsight judgment." Id. at 96, 85 S.Ct. at 228.

Quite apart from these considerations, however, it seems impossible on the record in this matter to hold that the original arrest of the petitioner, without a warrant, was lawful.

On the point of the arrest, it is undisputed that the ground for the arrest was that the petitioner was violating the conditions of his parole. (R. 12, 17, 18, 33, 42, 124 and 125) Respondent relies on the provisions of section 2941.46 of the Ohio Revised Code which provides in part that "When * * * a prisoner who has been paroled * * * violates any of the conditions of his * * * parole, or any of the rules and regulations governing the conduct of paroled prisoners prescribed by the pardon and parole commission, any * * * police officer upon being advised or knowing that such * * * prisoner * * *

has violated the conditions of his * * parole, shall forthwith arrest such person and report the same to the commission." It is contended that the arresting officer in this case knew that the petitioner was violating the regulations of the pardon and parole commission or the conditions of his parole, and hence could lawfully arrest him without warrant. This raises the interesting question of whether it is possible to know something that is not so.

The regulations of the pardon and parole commission were offered in evidence in two slightly different versions, appearing as State's exhibit 14 and defendant's exhibit B. Neither of these exhibits specifically forbids the petitioner from being on the streets after midnight, or from being in the company of a person with a criminal record.

Exhibit B does state, following seven enumerated "Rules of Parole", that instructions given by the Bureau of Probation and Parole or any of its supervisors or officers are accepted by the petitioner as part of the conditions of his parole. Exhibit 14 contains nineteen numbered "rules and regulations". The fourteenth of these is in similar language to that used in Exhibit B. Exhibit 14 also contains, as rule six, a provision that the parolee is not to associate with persons of bad reputation, with those having criminal records, or with other persons on parole.

■ It does not seem possible, under either dictionary or legal definition of the word "associate", to equate the fact of two persons being together on one specific occasion with the fact that they were associating. The record at most shows that petitioner knew Frank Di-Santo, who had a criminal record, and had met him on three or four prior occasions, but these facts were not known to the arresting officers, whose testimony showed that at most one of them had once before seen petitioner and DiSanto together.

*Corpus Juris Secundum* defines the verb "associate" as "To combine, join, or unite together", and the noun, "One often in company with another, implying intimacy or equality." 7 C.J.S. p. 16. Further, *Words and Phrases* sets forth the following:

"In ordinary nomenclature, the word 'associate' signifies to connect closely or join with others in a common purpose, activity, or responsibility, to partake or share in a common design, and implies participation by each of the individuals so united in the achievement of a common purpose." 4 Words and Phrases 559 (perm. ed. 1940).

With respect to the matter of a curfew, the arresting officer admitted that he did not know as a fact what the petitioner's deadline was (R. 20). Petitioner unequivocally denied that he was required to be in before midnight (R. 108, 109). While petitioner's parole officer testified that he had told petitioner to be off the streets before midnight (R. 765), on cross-examination he was vague about when he had done so, and admitted that he had made no notation that he had imposed this special condition upon petitioner, and that without a written record of the condition having been imposed, it would be difficult to charge petitioner with violation of it.

It is sometimes difficult to bear in mind that the resolution of the question of whether petitioner's arrest was a lawful one must be based upon the knowledge possessed by the police officers at one o'clock A.M., February 22, 1963, and not on what time, reflection, and investigation may have developed by September, 1963. Hence this Court should probably disregard the fact that the pardon and parole commission never did pass upon the question of whether or not petitioner was in violation of his parole on February 22, 1963. As will appear more at length at a later point in this opinion, the pardon and parole commission's determination on October 25, 1963, that petitioner was a parole violator on its face is based solely on the fact that he was, at that date, confined in the Ohio Penitentiary.

■ Thus we get back to the question of whether a police officer can know something that is not so, in this case, that the petitioner was, at the moment of his arrest on February 22, 1963, a parole violator. Under the circumstances shown in the record, the most that can be said is that he might possibly have been found to be a parole violator, if he were properly charged with being such, and if his entire testimony were to be disregarded. Since the statute only permits a police officer to arrest a person, being informed or knowing that he had violated the conditions of his parole, the arrest here was clearly not lawful.

■ Since the arrest was not lawful, but was unreasonable and without probable cause, the incidental search and seizure can rise no higher, and the evidence found thereby was admitted against the petitioner in violation of his constitutional rights, and his imprisonment, since it is in large part, if not entirely, based thereon, cannot stand.

The petitioner's further contention, that "the record of the evidence in this case is completely 'devoid of evidence pointing to guilt'" (Petitioner's Brief, p. 9) and thus that petitioner's conviction represents a denial of due process, it is not necessary to consider, in view of the determination of the other issues in the case.

■ The remaining question is whether the finding that petitioner is a parole violator, thus subjecting him to imprisonment upon his prior conviction, which he does not attack, precludes the granting of his petition for a writ of habeas corpus, since the writ cannot issue if the petitioner is not entitled to immediate release from his confinement. Holiday v. Johnson, 313 U.S. 342, 349 61 S.Ct. 1015, 85 L.Ed. 1392 (1941); McNally v. Hill, 293 U.S. 131, 137–139, 55 S.Ct. 24, 79 L.Ed. 238 (1934). Respondent argues that a finding of invalidity of the conviction attacked here— the 1963 conviction—will not entitle petitioner to release since he must still serve the balance of his 1955 conviction. Under Ohio law a prisoner first serves the sentence under conviction of the crime committed while on parole; he does not begin serving the balance of his earlier sentence until the termination of the second sentence, or until he has been paroled therefrom. See King v. Maxwell, 173 Ohio St. 536, 184 N.E.2d 380 (1962).

The Supreme Court resolved the question raised by respondent in Ex Parte Hull, 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941). The petitioner there, Cleio Hull, sought to attack his second conviction even though he was then confined on an earlier conviction because of revocation of parole pursuant to then-existing Michigan practice.[1] Parole revocation was based solely on the second conviction. The Court held "the petition is not premature." Id. at 549, 61 S.Ct. 640.

Petitioner DiMarco's situation is similar, although not exactly parallel. The minutes of the meeting of the Ohio Pardon and Parole Commission, quoted in the margin,[2] reveal that DiMarco was declared a parole violator solely on the basis of his 1963 conviction. His posi-

---

1. See Canfield v. Commissioner of Pardons and Paroles, 280 Mich. 305, 273 N.W. 578 (1937); Lundy v. Michigan, State Prison Board, 181 F.2d 772 (6th Cir. 1950).

2. "This inmate was received at the Ohio State Reformatory (#53–759) from Cuyahoga County January 11, 1955 to serve 10 to 25 years for burglary N/S W/Ct & Safe Tamp and armed robbery c/c. He was later transferred to the Ohio Penitentiary and given No. 111–455.
"According to law, this case became eligible for hearing, he was released on parole and was later returned as a parole violator. At the December 1961 meeting he was re-paroled on or after January 11, 1962 when arranged by the Bureau of Probation and Parole.

"This case was again brought to the attention of the Pardon and Parole Commission with information that Salvatore DiMarco is presently confined in the Ohio Penitentiary (118–080) and the Commission this day—October 25, 1963—by authority vested therein, hereby declares him a parole violator."

tion is different from that of Hull's in that he is now serving time on this later conviction and not the earlier one. This is inconsequential. It is merely a matter of variation in state procedure. A contrary rule would have the effect of insulating petitioner's second conviction from federal court scrutiny for constitutional defects. Such a rule has no place in our habeas corpus jurisprudence, "one of the precious heritages of Anglo-American civilization." Fay v. Noia, 372 U.S. 391, 441, 83 S.Ct. 822, 850, 9 L.Ed.2d 837 (1963).

This opinion will serve as findings of fact and conclusions of law. Since petitioner is presently confined in violation of his constitutional rights he must be released. Petitioner may prepare a proper order.

The Court expresses its appreciation to Mr. James R. Willis for his most helpful services as court-appointed counsel for petitioner.