385 F.2d 556
 Salvatore DiMARCO, Petitioner-Appellee,
v.
LaMoyne GREENE, Superintendent, Marion Correctional
Institution, et al., Respondent-Appellant.
Salvatore DiMARCO, Petitioner-Appellant,
v.
George DENTON, Chief Adult Parole Authority, and E. L.
Maxwell, Warden Ohio Penitentiary, Respondents-Appellees.
 Nos. 17411, 17653.
 United States Court of Appeals Sixth Circuit.
 Dec. 4, 1967.
 
 James R. Willis, Cleveland, Ohio, for DiMarco.
 James A. McLaughlin, Leo J. Conway, Asst. Attys, Gen., for Green, Denton and Maxwell, William B. Saxbe, Atty. Gen., on brief.
 Before WEICK, Chief Judge, PECK, Circuit Judge, and CECIL, Senior Circuit Judge.
 WEICK, Chief Judge.
 
 
 1
 DiMarco was convicted in the Common Pleas Court of Cuyahoga County, Ohio, on January 3, 1955, of burglary, safe tampering, armed robbery, and carrying concealed weapons. He was sentenced to an indeterminate term of ten to twenty-five years' imprisonment. He was later released on parole, returned as a parole violator, and confined until January 11, 1962, when he was again released on parole. While on parole the second time he was arrested without a warrant, for parole violation, by Cleveland police officers who were members of the Burglary Squad. A search of the automobile in which he had been riding disclosed burglary tools. He was then indicted, tried and convicted on October 2, 1963, in the Common Pleas Court of Cuyahoga County, for possession of burglary tools. He was sentenced to five years' imprisonment in the Ohio penitentiary. The Ohio Pardon & Parole Commission, finding that he was confined in the Ohio penitentiary, determined that he was a parole violator. He appealed from his conviction, which was affirmed by the Court of Appeals and the Supreme Court of Ohio dismissed his appeal.
 
 
 2
 After serving three years of the sentence for this conviction, he instituted habeas corpus proceedings in the United States District Court for the Northern District of Ohio, Western Division, attacking the validity of his conviction for possession of burglary tools and the action of the Ohio Pardon & Parole Commission determining that he was a parole violator, on the ground that evidence admitted against him had been obtained by an unconstitutional search and seizure.
 
 
 3
 The District Judge in a written opinion set aside his conviction and also the determination of the Ohio Pardon and Parole Commission that he was a parole violator, and ordered his release. 254 F.Supp. 776 (1966). The state has appealed from this order (No. 17,411).
 
 
 4
 The Ohio Pardon and Parole Commission then determined that DiMarco was a parole violator on grounds other than the conviction for possession of burglary tools, and ordered that he serve the remainder of his 1955 sentence. DiMarco then filed a habeas corpus petition in the United States District Court for the Southern District of Ohio, to review the action of the Ohio Pardon and Parole Commission in declaring him a parole violator. The District Court denied the petition and DiMarco appealed to this Court (No. 17,653).
 
 
 5
 We reverse the order of the District Court for the Northern District of Ohio granting a writ of habeas corpus, setting aside DiMarco's 1963 conviction and invalidating the action of the Ohio Pardon and Parole Commission in determining that he was a parole violator and ordering his release.
 
 
 6
 We affirm the order of the District Court for the Southern District of Ohio denying DiMarco's petition for a writ of habeas corpus.
 
 The 1963 Conviction
 
 7
 The facts and circumstances in relation to DiMarco's conviction for possession of burglary tools, were as follows: Three Cleveland police officers who knew that DiMarco was on parole, saw that he was in the company of Frank DiSanto, in an automobile driven by DiSanto, which stopped at a tavern in the Collinwood district in Cleveland, between 1:30 and 2:00 o'clock A.M. on February 22, 1963. DiSanto was known to the police as an exconvict who was then unemployed. He had been convicted of burglary in 1954, paroled and returned as a parole violator and had served his sentence. DiSanto got out of the automobile and went into the tavern, leaving the parolee, DiMarco, in the car with the motor running. The police walked up to the automobile in which DiMarco was seated, and told him he was under arrest for parole violation. One of the officers opened the door of the car, flashed a light on the inside of the car, and saw burglary tools which consisted of two crowbars, a large screwdriver and a pair of visegrip pliers. The police then opened the trunk of the car and found an electric drill. When DiSanto saw the police he ran out the rear door of the tavern and disappeared. The automobile, which had been loaned to DiSanto by a woman, was placed in a garage by the police, and on the following day the garageman, upon entering the car to move it, discovered a pistol partially exposed under the right front seat. The garageman called the police and they removed the pistol from the car.
 
 
 8
 DiMarco's motion to suppress the evidence found in the car was denied by the Court in the criminal case and the evidence found in the car was admitted against him over his objection.
 
 
 9
 The District Court determined the issues in the habeas corpus case solely from a transcript of the evidence adduced in the criminal trial. We will consider the issues in the order treated by the District Court.
 
 The Search as Incident to the Arrest
 The District Judge stated in his opinion:
 
 10
 'It is very clear from the decisions of the Supreme Court that the right to make a search without a warrant, contemporaneously with an arrest, is limited to a search for weapons, or for the fruits of, or implements used to commit, the crime for which the arrest is made. Weeks v. United States, 232 U.S. 383, 392, 34 S.Ct. 341, 58 L.Ed. 652 (1914); Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145 (1925).
 
 
 11
 'Bearing in mind that the undisputed evidence here was that the petitioner's arrest was solely for violation of parole, in that he was out after midnight, with a person with a criminal record, it follows that the only things that could lawfully be seized would be 'things connected with the crime as its fruits or as the means by which it was committed, as well as weapons, and other things to effect an escape from custody * * *' Ibid. What are the fruits of the crime of violation of parole? By what means was that crime, in the present instance, committed? Certainly not crowbars and electric drills. The weapon was not found until long after petitioner was incarcerated and the automobile was secured from removal or tampering. No conceivable justification for its admission can be found. Preston v. United States, 376 U.S. 364, 368, 84 S.Ct. 881 (11 L.Ed.2d 777) (1964). It is impossible to imagine that admission of the weapon into evidence was not extremely prejudicial to the petitioner.' 254 F.Supp. 776, 779.
 
 
 12
 In our opinion the right to search as incident to a lawful arrest is not so narrowly restricted. The correct rule was stated by Mr. Justice Black, who delivered the unanimous opinion of the Court in Preston v. United States, 376 U.S. 364, 367, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964), as follows:
 
 
 13
 'Unquestionably, when a person is lawfully arrested, the police have the right, without a search warrant, to make a contemporaneous search of the person of the accused for weapons or for the fruits of or implements used to commit the crime. Weeks v. United States, 232 U.S. 383, 392, 34 S.Ct. 341, 58 L.Ed. 652 (1914); Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 5, 70 L.Ed. 145 (1925). This right to search and seize without a search warrant extends to things under the accused's immediate control, Carroll v. United States, supra, 267 U.S. 132, at 158, 45 S.Ct. 280, 69 L.Ed. 543, and, to an extent depending on the circumstances of the case, to the place where he is arrested, Agnello v. United States, supra, 269 U.S., at 30, 46 S.Ct. 4; Marron v. United States, 275 U.S. 192, 199, 48 S.Ct. 74, 72 L.Ed. 231 (1927); United States v. Rabinowitz, 339 U.S. 56, 61-62, 70 S.Ct. 430, 94 L.Ed. 653 (1950). The rule allowing contemporaneous searches is justified, for example, by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime-- things which might easily happen where the weapon or evidence is on the accused's person or under his immediate control.'
 
 
 14
 The Fourth Amendment prohibits only unreasonable search. The reasonableness of the search must be determined by the circumstances of each case. United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950). In the present case the police were dealing with two convicted burglars, one of whom, the officers observed was violating his parole. The mere fact that the cursory search made by the officers at the scene revealed only burglary tools and not the pistol, did not militate against the validity of the search.
 
 
 15
 Nor does the fact that the search turned up evidence used to convict DiMarco of the crime of possession of burglary tools, which was unrelated to the arrest for parole violation, render the search unlawful. Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960) (evidence seized incident to lawful arrest for immigration violation used to convict defendant of espionage). Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); Moore v. United States, 117 U.S.A.pp.D.C. 376, 330 F.2d 842 (1964); United States v. Sorenson, 330 F.2d 1018 (2nd Cir. 1964); United States v. Jackson, 22 F.R.D. 38 (S.D.N.Y., 1958) (Arrest for parole violation, search disclosed narcotics).
 
 
 16
 The District Court did not have the benefit of the recent decision of the Supreme Court in Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), which held that the Fourth Amendment does not require a distinction to be made between items of only evidential value and contraband, fruits or instrumentalities of crime.
 
 
 17
 The discovery of the pistol in the car by the garage attendant on the following day was purely accidental. He saw the pistol partially exposed in plain view under the right front seat when he entered the car to move it. He was not making a search of the car, nor was he authorized by the police to do so. In our opinion, what the attendant did certainly did not constitute a search, either actually or in law. Cf. Fagundes v. United States, 340 F.2d 673, 675-676 (1st Cir. 1965). The term 'search' implies an examination of the person or property to discover contraband or evidence. United States ex rel. Stacey v. Pate, 324 F.2d 934 (7th Cir. 1963).
 
 
 18
 In the alternative, if discovery of the pistol constituted a search, then it was lawful as an incident to the arrest. Only a cursory search was made by the police at the scene because of conditions then and there existing. The police officers, instead of the attendant, could have made the search at the garage on the following day while the car was still in their custody and where a search would have been more conveniently made and better performed. Cf. Cooper v. State of California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967).
 
 Validity of the Arrest
 
 19
 The next question to be determined is whether the arrest without a warrant by the police officers for parole violation was valid. This must be determined by Ohio law. The Ohio statutes authorize a parole officer to arrest when he has reasonable grounds to believe that there has been a violation of a condition of parole. A police officer is authorized to arrest upon being advised, or when he knows, that a parolee has violated the conditions of his parole. Ohio Rev.Code 2941.46. This right is similar to that of a police officer to make an arrest for a misdemeanor committed in his presence.
 
 
 20
 The police had not been advised that DiMarco was a parole violator. The only question is whether they knew that he was violating a condition of his parole when they saw him.
 
 
 21
 The police officers knew that DiMarco was a parolee and that DiSanto was an unemployed exconvict. They knew that generally there is a midnight curfew imposed on parolees, but they did not know specifically that one had been imposed upon DiMarco. They knew of the parole condition forbidding all parolees to associate with persons having a criminal record. They knew that DiMarco, a parolee, was in the company of DiSanto, an exconvict, at between 1:30 and 2:00 o'clock A.M. on February 22, 1963, when their car stopped in front of a tavern, and that both of them had previously been convicted of burglary and armed robbery. One of the policemen had seen them together on a previous occasion.
 
 
 22
 We agree with the District Judge that the officers had no actual knowledge of the imposition of the curfew as one of the conditions of DiMarco's parole, although the parole officer testified at the trial that in fact it had been imposed. It could not therefore properly be a ground for DiMarco's arrest by police officers for parole violation because they did not know. State v. Call, 8 Ohio App.2d 277, 220 N.E.2d 130 (1965). But the District Judge went further and held, as a matter of law, that DiMarco was not associating with DiSanto. We think he construed the parole condition too narrowly. He relied on definitions of 'associate' appearing in Words & Phrases and Corpus Juris. None of these definitions were in the context of parole rules. A more general definition of the word 'associate' is contained in Volume I, Webster's Third New International Dictionary as follows:
 
 
 23
 'To join often, in a loose relationship as a partner, fellow worker, colleague, friend, companion or ally. * * *'The undoubted purpose of the parole condition was to forbid parolees from keeping company with convicts or other persons of bad reputation. One of the police officers had seen DiMarco and DiSanto together on a previous occasion. Certainly when he was seen again in an automobile driven by DiSanto, stopping at a tavern between 1:30 and 2:00 o'clock A.M., the police officers were justified in concluding that he and DiSanto were together as friends or companions. This was sufficient knowledge to authorize the police officers to make the arrest. It was for the Parole Commission to declare DiMarco a parole violator, which they later did.
 
 
 24
 If any proof is needed to show that exconvicts and parolees know what the word 'associate' means in the parole condition, the excuse given by DiMarco's companion, DiSanto, for running out the back door of the tavern when he saw the police officers, is ample proof. DiSanto testified:
 
 
 25
 'A And I saw the detectives talking to Sam (Sal) DiMarco, and I had observed from there for awhile and I knew that Sam (Sal) had a record because I had knew him a couple of times before that, I had seen him three or four times, and I didn't want to get him into trouble, because when I went away it was for association and I knew--
 
 
 26
 MR. PATTON: I am going to object to this, your honor. The only issue before this Court is the search and seizure at this time.
 
 
 27
 MR. CIPOLLONE: Oh, boy--
 
 
 28
 THE COURT: He may answer. A Well, your Honor, and I went away for association-- at the time I was convicted of that burglary I received probation and I was on two and a half years. I had five more months to go and I went away for association, and I-- I didn't want to put my-- myself to be responsible for anything that might happen to Sam (Sal).
 
 
 29
 'I mean the way I felt, if he wanted to tell him (the police officer) George Washington was driving, as long as it wasn't my fault, that is the way I felt, and I saw the detectives were there and it was just a funny spot and I didn't know what to do and I left out the back door.'
 
 
 30
 'He was-- I have known Sam (Sal) for-- maybe I have seen him three or four times before that on the West Side and I used to shoot pool at this establishment and I used to eat across the street from it and I met Sam (Sal) in there one time and Sam (Sal) had offered to drive me home. * * * Q And when you came out of the bar and saw the detectives, you are telling this Court that you ran away from there because you didn't want the police to see you with DiMarco? A I didn't come out of the bar, I observed him through the window and I didn't want to get the follow in trouble.'
 
 
 31
 In our opinion, under Ohio law the arrest was lawful.
 
 Parole Violations
 
 32
 The reversal of the judgment in No. 17,411 renders moot the issues in No. 17,653. But even assuming that the District Court was correct in setting aside DiMarco's 1963 conviction, in our opinion it was error for the Court to go further and set aside the action of the Ohio Pardon and Parole Commission declaring that DiMarco was a parole violator.
 
 
 33
 The reason given by the District Court for setting aside DiMarco's conviction for possession of burglary tools was not that he was innocent of the charge, but that his conviction was in violation of exclusionary rules of evidence. The setting aside of this conviction in our judgment did not affect the validity of his prior conviction and sentence in 1955, which had not been served. It did not absolve him from serving the remainder of his sentence when he was declared a parole violator. The 1955 conviction was not attacked.
 
 
 34
 The Commission had statutory authority to declare DiMarco a parole violator. Ohio Rev.Code 2965.21, in effect at the time, provided in part:
 
 
 35
 '* * * a prisoner who has been paroled, who in the judgment of the pardon and parole Commission has violated the conditions of his * * * parole shall be declared a violator.'
 
 
 36
 There was substantial evidence in the record tending to prove that DiMarco had violated the conditions of his parole in three different respects, namely, (1) the curfew, (2) association with a person having a criminal record, and (3) conviction of a crime.
 
 
 37
 The Commission declared DiMarco a parole violator on October 25, 1963, when it obtained 'information that Salvatore DiMarco is presently confined in the Ohio penitentiary'. It did not mention the other grounds of parole violation. There is nothing in the Ohio statutes requiring it to do so. The Commission merely declares the parolee a parole violator when it finds that he has violated any of the conditions of his parole. Nor is there anything in the record to indicate that any violation was waived or abandoned. The Commission simply referred to the one ground most easily established and about which there was no question at the time.
 
 
 38
 The District Court in setting aside the conviction and ordering DiMarco's release, did not pass upon the question of whether the evidence in the record was sufficient to support the declaration by the Commission of parole violation on the other two grounds. Indeed, the District Court had no jurisdiction to review the action of the Parole Commission in this respect. Its power of review was limited solely to determining whether there had been violation of the constitutional rigthts of the parolee.
 
 
 39
 Since there was substantial evidence in the record to sustain the action of the Commission, it was error for the District Court to set it aside. Where a decision of an administrative agency, or even a court, is correct, it should be sustained by a reviewing court even though the decision does not cite all of the supporting grounds.
 
 
 40
 After the District Court had released DiMarco on bail, the Adult Parole Authority, successor to the Ohio Pardon and Parole Commission, acting uner Ohio Rev.Code 2967.15, declared DiMarco a parole violator on the other grounds and he is presently confined in the Ohio penitentiary. At his request, a hearing was granted at which he was represented by his counsel, but the Parole Authority adhered to its previous action. The record of that hearing is not before us. In any event, we are without authority to review the decision of the Adult Parole Authority except for constitutional deprivation.
 
 
 41
 In Ohio, a parolee remains in legal custody of the Department of Mental Hygiene and Correction of the state, until final release is granted by the Adult Parole Authority. Ohio Rev.Code 2967.01(E). Such a prisoner is in custody within the meaning of 28 U.S.C. 2241. Jones v. Cunningham, 371 U.S. 236, 83 S.Ct. 373, 9 L..ed.2d 285 (1963).
 
 
 42
 The status of a parolee in Ohio is 'similar to that of a prisoner in a penal or reformatory institution, who, because of good behavior, may, as a so-called 'trusty,' be allowed temporarily to leave the confines of the institution, but who is obviously, while enjoying that privilege, still within the legal custody and under the control of the head of that institution.' In re Varner, 166 Ohio St. 340, 346-347, 142 N.E.2d 846, 850 (1957).
 
 
 43
 A prisoner has no constitutional right to parole. It is conferred as a matter of grace-- a privilege and not a right. While on parole and until he has been granted a final release, the parolee is a convicted felon. Cf. Escoe v. Zerbst, 295 U.S. 490, 55 S.Ct. 818, 79 L.Ed. 1566 (1935); Burns v. United States, 287 U.S. 216, 220, 53 S.Ct. 154, 77 L.Ed. 266 (1932); Jay v. Boyd, 351 U.S. 345, 76 S.Ct. 919, 100 L.Ed. 1242 (1956); Cox v. Maxwell, 366 F.2d 765 (6th Cir. 1966).
 
 
 44
 Since a prisoner has no constitutional right to parole, it follows that the state is not required to provide for parole, and when it does, it may stipulate the terms and conditions and also may define the status of the parolee. We find no violation of the Constitution in the procedures of the Parole Commission in the present case.
 
 
 45
 The judgment of the District Court is reversed in case number 17,411, and affirmed in case number 17,653.