Herbert E. ROSE, Petitioner-Appellant,

v.

E. B. HASKINS, Superintendent,
Respondent-Appellee.

No. 17809.

United States Court of Appeals
Sixth Circuit.

Jan. 5, 1968.

Herbert E. Rose, in pro. per.

William B. Saxbe, Atty. Gen. of Ohio, Leo J. Conway, Asst. Atty. Gen. of Ohio, Columbus, Ohio, for appellee.

Before WEICK, Chief Judge, and CELEBREZZE and PECK, Circuit Judges.

WEICK, Chief Judge.

This appeal involves an important question of law relating to the power and authority of the federal courts in a habeas corpus proceeding to review an order of a state parole board revoking the parole of a prisoner who had been twice convicted of crimes in the state court, paroled twice, declared a parole violator the second time, and returned to state prison to serve his sentence there rather than outside the prison. The prisoner contends in this Court that his right to due process of law under the Fourteenth Amendment was violated when the state parole board declared him a parole violator without a hearing. This contention requires a determination as to whether a paroled prisoner, in custody of prison authorities, who has not served his sentence, possesses rights as distinguished from privileges. Resort must be had to state law to ascertain the status of state prisoners.

Rose was convicted in 1961 upon his plea of guilty in the Common Pleas Court of Franklin County, Ohio, to ten counts of an indictment charging him with committing forgeries. He was sentenced to an indeterminate term of from one to twenty years in the Ohio prison. While on parole he was convicted again in 1963 in the same court for issuing checks without sufficient funds in the bank, and was sentenced to concurrent terms of from one to three years' imprisonment.

No appeals were taken from either of these judgments of conviction or the sentences. Rose has never questioned their validity. In 1964 Rose was paroled on the 1963 sentence and reparoled on the 1961 sentence. In 1965 the Parole Commission again declared Rose a parole violator and returned him to prison, when it received information that he had molested his minor daughter. Such an offense is a felony under Ohio law, Ohio Rev.Code § 2903.01, and a violation of the conditions of his parole. His maximum sentence on the 1961 conviction will expire on October 14, 1982.

Rose instituted habeas corpus actions in the Court of Common Pleas of Madison County, Ohio, and in the Court of Appeals of that County, but was denied relief. He filed a habeas corpus proceeding in the Supreme Court of Ohio but that Court relegated him to his remedies under Ohio's new post-conviction statutes. Ohio Rev.Code § 2953.21 to 2953.-24, inclusive (Supp. 1966). He did not pursue those remedies. Instead he filed a habeas corpus petition in the United States District Court for the Southern District of Ohio, which was dismissed without a hearing. This appeal followed.

The papers filed by Rose in the District Court indicate that after his arrest for parole violation, he requested the Assistant Prosecuting Attorney of Franklin County to prosecute him for the offense of molesting his daughter, so as "to afford me the right of defense", but he claims that the Prosecutor declined to do so giving as a reason that he could not prosecute without a warrant from his accuser. It should be observed also that such a prosecution, if successful, would add only an additional sentence to

the seventeen years remaining to be served on his prior sentences.

Rose alleged in his habeas corpus petition that he was entitled under the Constitution to the "benefit of confrontment of his accusers, examination of witnesses, arraignment on the indictment, legal counsel, trial by jury, and the privilege of appeal", and that the action taken against him by the Parole Commission violated rights guaranteed to him under the Fourth, Fifth, Sixth, Eighth, Thirteenth and Fourteenth Amendments to the Constitution.

In the District Court Rose also filed a motion for a subpoena duces tecum to require the attendance of the Chairman and another member of the Parole Commission, and the production of all records of the Commission pertaining to his case, including reports to the Commission made by his parole officer and the district parole supervisor. He also requested subpoenas for the Assistant Prosecuting Attorney, for Rose's ex-wife who was his accuser, and for his father and mother. It is apparent that what Rose wanted was a trial in the District Court on the issue of his guilt for molesting his minor daughter.

The record does not show that he ever requested the Parole Commission to grant him a hearing. Limited hearings have been granted by the Parole Commission upon request, DiMarco v. Denton, 385 F.2d 556 (6th Cir. 1967), but not a judicial hearing.

In State ex rel. London v. Ohio Pardon & Parole Comm., 2 Ohio St.2d 224, 208 N.E.2d 137 (1965), the Supreme Court of Ohio held:

"Relator was returned to the Ohio Penitentiary in September 1963 as a parole violator. After his return thereto, he had a hearing before the commission, and his parole was revoked for the violation of four different rules of parole. Relator apparently is urging in his petition that he is entitled at his hearing on a violation of parole to all the rights accorded an accused in his original trial such as compulsory process to procure witnesses, counsel, etc. In other words, a complete judicial hearing.

"The position of the parolee was thoroughly considered in In re Varner, 166 Ohio St. 340, 142 N.E.2d 846. See also State ex rel. Newman v. Lowery, et al, Ohio Pardon and Parole Commission, 157 Ohio St. 463, 105 N.E.2d 643.

"The reasoning in the Varner case in relation to habeas corpus is equally applicable to an action in mandamus. The demurrer is sustained, and the writ is denied."

■ It is axiomatic that the administration of the state's penal system is exclusively a state function under the reserved powers in the Constitution. The state may thus enact legislation defining what conduct constitutes a crime and fixing the sentence to be imposed upon conviction therefor and the manner in which the sentence shall be served. The execution of the sentence is within the authority of the state's executive department. The state is not required to provide for parole and, if it does, may stipulate its terms and conditions as well as the status of a parolee. Parole is a matter of grace in Ohio, DiMarco v. Denton, Warden, 385 F.2d 556 (6th Cir. 1967); Cox v. Maxwell, Warden, 366 F.2d 765 (6th Cir. 1966).

Ohio has defined the status of a parolee. Ohio Rev.Code § 2965.01(E), in effect at the time, provided:

"(E) 'Parole' means the release from confinement in any state penal or reformatory institution, by the pardon and parole commission upon such terms as the commission prescribes. *A prisoner on parole is in the legal custody of the department of mental hygiene and correction, and under the control of the commission.*" (Italics ours.)

■ A state prisoner on parole is in custody within the meaning of 28 U.S.C. § 2241. Jones v. Cunningham, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963).

Ohio Rev.Code § 2965.21, then in effect, conferred power on the Parole Com-

mission to determine parole violations. It provided in part:

"* * * [A] prisoner who has been paroled, who in the judgment of the pardon and parole commission has violated the conditions of his * * * parole shall be declared a violator."

■ Nowhere in the parole statutes is there a provision for a hearing on parole revocation. Nor do the statutes provide for judicial review. The orders of the Commission are final in Ohio.

In re Varner, 166 Ohio St. 340, 142 N.E.2d 846 (1957), the Supreme Court of Ohio construed the Ohio parole statutes. Judge Taft, now Chief Justice, in delivering the opinion of the Court, said:

"There are statutory expressions which clearly indicate a legislative intent that a convict should be on parole only where his freedom would be consistent with the protection, welfare and security of society. Section 2965.09 Revised Code. It is apparent that the General Assembly expressly regarded such protection, welfare and security as of far more importance than even the temporary freedom on parole of any convicted felon.

"There is no express statutory requirement of any hearing before the commission declares a parolee to be a violator, and, where he is a violator, he may be arrested forthwith. Also, there is no apparent limitation provided with respect to the authority and power of the commission to determine that a parole violator should be imprisoned. Section 2965.21, Revised Code. In contrast there are some limitations on the authority of the commission to parole a convict. Sections 2965.18 and 2965.23, Revised Code.

"Under our statutes, one convicted of a felony does not cease to be a convicted felon when he is paroled. There is no 'remission of penalty' as there is with respect to a pardon. Subdivision (B) of Section 2965.01, Revised Code. As our statutes indicate, when a person is paroled, he is thereby merely released from confinement in a penal or reformatory institution. While on parole, he still remains 'in the legal custody of the department of mental hygiene and correction and under the control of the commission.' Subdivision (E) of Section 2965.01, Revised Code. His position, though usually more desirable, is in substance similar to that of a prisoner in a penal or reformatory institution who, because of good behavior, may, as a so-called 'trusty,' be allowed temporarily to leave the confines of the institution, but who is obviously, while enjoying that privilege, still within the legal custody and under the control of the head of that institution. It would hardly be contended that such a prisoner would be entitled to any hearing because of a determination by the head of the institution that he was no longer entitled to privileges which he had previously been accorded as a trusty. Nor could it reasonably be contended that any court should be required to review such a determination in the absence of legislation specifically providing therefor. The convicted felon is such either by reason of his plea of guilty or by reason of the determination of a jury that his guilt has been proved beyond a reasonable doubt. He does not cease to be a convicted felon merely because he has been paroled." (pp. 346–347, 142 N.E.2d 850)

In Varner parole was revoked even though an indictment which was the basis of a detainer placed against the parolee, had been dismissed.

Varner was approved and followed by the Supreme Court of Ohio in Bussey v. Sacks, 172 Ohio St. 392, 176 N.E.2d 220 (1961), Guerrieri v. Maxwell, Warden, 1 Ohio St.2d 75, 204 N.E.2d 60 (1965), State ex rel. London v. Ohio Pardon & Parole Comm., 2 Ohio St.2d 224, 208 N.E.2d 137 (1965), and Barnhart v. Maxwell, Warden, 2 Ohio St.2d 308, 208 N.E.2d 752 (1965).

It may be true, as the Supreme Court of Ohio suggested, that in Ohio the legislature, in granting broad discretionary powers to the Parole Commission, has shown far more concern for the protec-

tion, welfare and security of its inhabitants than for the temporary freedom on parole of a convicted felon. We know of no reason why it cannot do so.

Construing the Ohio parole statutes, the Supreme Court of Ohio in Varner has relegated the status of a parolee to substantially the same position as a "trusty", who may "be allowed temporarily to leave the confines of the institution, but who is obviously, while enjoying that privilege, still within the legal custody and under the control of the head of that institution." Id. 346. A trusty certainly cannot complain that his constitutional rights have been violated if his privileges are withdrawn. A parole in Ohio does not end the sentence.

Under Ohio law the "trusty" and "parolee" have privileges, not rights, until they have served their sentences. The Parole Commission may declare a prisoner, who has been paroled, a violator when *in its judgment* he has violated the conditions of his parole. The Commission has exercised its judgment in this case. It declared Rose a parole violator. It was not required to provide a hearing. None was requested.

The constitutional rights of Rose, which he claims were violated, apply *prior* to conviction. They are not applicable to a convicted felon whose convictions and sentences are valid and unassailable, and whose sentences have not been served. A state prisoner does not have a constitutional right to a hearing on a state parole revocation.

In 67 C.J.S. § 23 Pardons p. 619, the rule is stated:

"A parolee has no constitutional right to a hearing on the question of revoking his parole; and, in the absence of a statutory provision for notice and hearing, a parole may be revoked without such notice and hearing, whether authority to revoke is vested in the governor, the court or judge granting the parole, the board of parole, prison commissioners, or an adult authority." (Footnotes omitted)

In 39 Am.Jur., page 525, it is stated:

"A parole, especially such as is contemplated by most statutes providing therefor, is distinguishable from a pardon and from a conditional pardon. The parole intended by most of these statutes does not end the sentence, and, whatever may be the theory of a parole on general principles, those granted under some statutes do not even suspend the sentence. The prisoner is not a free man while out on parole, and he continues to serve time on his sentence until the expiration thereof. Parole statutes simply provide for a different manner of serving a sentence than by confinement in a prison. A power to pardon is something more than a power to parole or a power to release from servitude." (Footnotes omitted)

Even in the federal parole system, where Congress has provided for a hearing in parole revocation proceedings, the hearing is limited and does not approach a judicial proceeding. Hyser v. Reed, 318 F.2d 225 (D.C.Cir., 1963).

The Supreme Court of the United States has held that the privilege of a probationer is not a right guaranteed by the Constitution, but "comes as an act of grace to one convicted of a crime and may be coupled with such conditions in respect of its duration as Congress may impose." In the absence of statutory provision, the probationer is not entitled to a hearing on revocation. Escoe v. Zerbst, 295 U.S. 490, 492, 493, 55 S.Ct. 818, 819, 79 L.Ed. 1566 (1935); Burns v. United States, 287 U.S. 216, 53 S.Ct. 154, 77 L.Ed. 266 (1932). See also State ex rel. Harris v. Ragen, 177 F.2d 303 (7th Cir. 1949).

Jay v. Boyd, 351 U.S. 345, 76 S.Ct. 919, 100 L.Ed. 1242 (1956) involved denial of application for suspension of deportation without a hearing and the use of confidential information not disclosed to applicant. Mr. Justice Reed, in delivering the opinion of the Court, said:

"Like probation or suspension of criminal sentence, it 'comes as an act of grace', Escoe v. Zerbst, 295 U.S. 490, 492, [55 S.Ct. 818, 79 L.Ed. 1566,] and

'cannot be demanded as a right', Berman v. United States, 302 U.S. 211, 213, [58 S.Ct. 164, 82 L.Ed. 204]. And this unfettered discretion of the Attorney General with respect to suspension of deportation is analogous to the Board of Parole's powers to release federal prisoners on parole." (p. 354, 76 S.Ct. p. 924).

In Cafeteria and Restaurant Workers Union Local 473 v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) the Court said:

> "Where it has been possible to characterize that private interest (perhaps in oversimplification) as a mere privilege subject to the Executive's plenary power, it has traditionally been held that notice and hearing are not constitutionally required."

In Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) the Supreme Court grounded its decision upon statutory interpretation and not on the Constitution.

In United States v. Sullivan, 55 F. Supp. 548 (D.C. E.D.Ill., 1944), Judge Lindley, in denying a petition for habeas corpus to review a state parole board's order revoking parole, said:

> "In disposing of this contention, we are not called upon to review the record of any judicial proceeding. We are confronted merely with the question of whether the state administrative body, endowed by statute with discretion to determine whether a parole should be granted, may, after having once acted favorably, thereafter revoke the earlier order and deny parole. In the performance of their duties, such administrative officers are called upon to exercise judgment and discretion, to investigate, deliberate and decide. People v. Joyce, 246 Ill. 124, and 135, 92 N.E. 607, 20 Ann.Cas. 472. The court's jurisdiction and duties ended when the judgment was entered; thereafter the execution of the sentence was within the sole authority of the executive department of the state. The manner of executing the sentence and extension or mitigation of punishment are fixed by the legislative department and what it has determined must be put in force and effect by the administrative or executive officers in whom the power is lodged. People v. Joyce, supra. The administration of the parole law is the exercise, through the administrative department, of the state's power to keep safely, supervise and discipline its prisoners. Such powers are not judicial but are matters of 'prison discipline.' People v. Joyce, supra.

> "If the federal court were to review the discretionary acts of a state prison administrative body, then it would necessarily assume paramount power and authority over the state's control of its prisoners. To do so is far beyond the review of judicial records, legitimately within the purview of a habeas corpus proceeding. I shall not embark upon such an undertaking. The jurisdiction to interfere with the proceedings of state governmental bodies charged with the prosecution and punishment of offenders is an exceedingly delicate one to be exercised with the greatest of care and nicest sense of propriety." (pp. 550–551)

In Johnson v. Avery, 382 F.2d 353 (6th Cir., 1967) the reluctance of federal courts to interfere with state prison discipline was emphasized.

Our decision in Fleenor v. Hammond, 116 F.2d 982 (6th Cir. 1941) is inapposite. That case involved revocation of a conditional pardon, not parole. A conditional pardon had been granted by a Governor of Kentucky and the pardon was revoked by his successor without notice or hearing. There were no statutory regulations in Kentucky governing the issuing of conditional pardons. After receiving the pardon, the convict was no longer in custody or under control of the state. While the granting of the pardon was an act of grace, yet, when it was granted, the convict acquired rights which could not be taken away from him without notice or hearing.

The Court of Appeals of Kentucky, in a case involving parole revocation, distin-

guished *Fleenor* and pointed out the fundamental differences between conditional pardon and parole in Mahan v. Buchanan, 310 Ky. 832, 221 S.W.2d 945 (1949). The differences were that parole in Kentucky was regulated by statute under which the prisoner at all times remained in the custody and under control of the state, and that he was not a free man but continued to serve his sentence until the expiration thereof. In reality, the parole statutes simply provided a different manner of serving a sentence than by confinement in prison.

 The distinction between conditional pardon and parole is also made in 39 Am.Jur. § 11, at page 525, and was cited with approval by the Kentucky Court of Appeals. We must accept the decision of the highest court of Kentucky as declaratory of the law of that state on the difference between its procedures on conditional pardon and on parole. Fleenor v. Hammond, supra, at page 685.

We do not regard the recent decision of the Supreme Court in Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967) as throwing light on our problem. In that case sentencing in the state court had been deferred subject to probation. The case was still pending in the state court. The Supreme Court held that the defendant was entitled to counsel at the sentencing when probation was revoked.

In the present case, the sentencing had been completed in 1961 and 1963. Jurisdiction of the state court had terminated and Rose was in custody of the state prison authorities. No question is involved as to validity of the judgments of conviction or the sentencing. Involved here is not judicial power, but state prison discipline administered by the state parole board.

 Since the habeas corpus petition did not state a claim upon which relief could be granted, it was not error for the District Court to dismiss it.

 Appellee further contends that Rose did not exhaust state remedies

available to him under Ohio's new post-conviction statutes, Ohio Rev.Code §§ 2953.21 to 2953.24, inclusive, (Supp. 1966). An examination of these statutes reveals that they were designed to test the validity of a judgment of conviction and to vacate and set aside the sentence where the judgment was void or voidable. They do not confer jurisdiction to review orders of the state's parole commission.

In our opinion, Rose has no remedy under Ohio law to review the order of the Parole Commission, as its order is final. In any event, by filing habeas corpus actions in the Court of Common Pleas, Court of Appeals, and the Supreme Court of Ohio, in which relief was denied, Rose exhausted whatever remedy the state provided.

If too much power over state prisoners has been confided to the Parole Commission by the legislature, the reformation should be made by the legislators and not by the courts. Federal Courts cannot be expected to remedy all ills, real or imaginary, in the state's prison disciplinary procedures.

Affirmed.

CELEBREZZE, Circuit Judge (dissenting).

This case was brought upon a *pro se* petition for habeas corpus relief. At no time was the Petitioner afforded the expert advice and assistance of counsel in framing his pleading. So it is incumbent upon this Court to fasten its attention upon what this Petitioner was denied, not what the Petitioner in his ignorance of the law asked for. By the uncontroverted facts, the Petitioner was denied a hearing of any kind upon the revocation of his parole. The question is whether that action by the Parole Commission violates Due Process of law. I think that it does, and, therefore, I must dissent from the decision of the Court.

I agree with the majority that this case presents no question of exhaustion of State remedies. Ohio has no procedure for review of a decision of the Parole

Commission.[1] Since a petition in the State courts would be a "futile gesture", such action by the Petitioner is not required to satisfy the demands of 28 U.S.C. § 2254 (1959). Coley v. Alvis, 381 F.2d 870 (6th Cir. 1967).

I cannot agree, however, with the majority's apparent conclusion that no federal constitutional rights are involved in this case.

To put the case in its legal perspective, what is involved here is an administrative action of a state agency that adversely affects a parolee's interest in his conditional liberty.[2] In Fleenor v. Hammond, 116 F.2d 982 (6th Cir. 1941), this Court held that because of due process considerations a conditional pardon could be revoked for violation of a condition only after a hearing fitted in its range

to the needs of the occasion. Contrary to the majority's interpretation, that case was not based upon any "rights" that are acquired through the grant of a pardon and that are not given by parole statutes. In *Fleenor* the Court specifically recognized that in making the constitutional determination under the Due Process Clause it was not bound by the law of Kentucky. Instead of relying upon the restoration of civil rights that follow a full pardon, the Court said that pardon could be assimilated to probation.[3] In the context of revocation, a parole can be assimilated to both. Given that assimilation, the *Fleenor* case is directly in point with the instant case and should control the decision of this Court. At the present time, however, a wide divergence of opinion exists concerning the right to a hearing upon revocation of parole.[4]

1. An action by the Parole Commission in revoking a parole is not reviewable by habeas corpus in Ohio. In re Varner, 166 Ohio St. 340, 142 N.E.2d 846 (1957). Nor will mandamus lie to control the discretion of the Parole Commission. Swiss v. Ohio Pardon & Parole Commission, 117 Ohio App. 141, 191 N.E.2d 186 (1963). Neither is prohibition a proper remedy to prohibit an act that has been fully and finally performed. State ex rel. Gem Coal Co. v. Young, 109 Ohio App. 457, 164 N.E.2d 190 (1959). Certiorari is not recognized in Ohio, having been displaced by statutory procedure, as have other common law writs, such as coram nobis. State v. Chapman, 159 N.E.2d 374 (Ohio App.1958). In the Ohio courts the only possible review of the action of the Parole Commission would be by appeal under Ohio Revised Code § 2506.01 (Supp.1957), and this procedure is available only if the Parole Commission is considered by the courts as that type of agency whose actions are reviewable under this statute, see §§ 2506.01 (Supp.1957) and 2505.07 (Page 1954), which point is not at all clear; and, in any event, the appeal must be perfected within ten days. Time for appeal has run out for the Petitioner, so, if the constitutional question presented is to be decided by any court, it must be decided in this habeas proceeding.

2. Fictions of "custody" and the like that have been created by statute or court decisions cannot change the reality of a parolee's conditional freedom and cannot affect the constitutional protections

surrounding his interest in that conditional freedom. See infra.

3. At the time of the Fleenor decision it was considered that there was no constitutional right to a hearing upon revocation of probation. Burns v. United States, 287 U.S. 216, 53 S.Ct. 154, 77 L.Ed. 266 (1932).

4. Twenty-five states and the District of Columbia have statutes that specifically require a hearing upon revocation of parole. Nine state statutes seem to specifically authorize revocation without a hearing. Sixteen state statutes give no indication of whether a hearing is required, but in seven of these states the courts have interpreted the statute as not requiring a hearing. See Sklar, Law and Practice in Probation and Parole Revocation Hearings, 55 J.Crim.L., Crim. and P.S. 175 (1964); Annot., 29 A.L.R.2d 1074 (1953). In at least three of the states where the statute is silent, however, the courts in cases similar to parole have based a hearing requirement, either expressly or impliedly, on the demands of due process. See Baine v. Beckstead, 10 Utah 2d 4, 347 P.2d 554 (1959); Hudson v. Youell, 178 Va. 525, 17 S.E.2d 403 (1941) modified on other grounds, 179 Va. 442, 19 S.E.2d 705 (1942); People ex rel. Joyce v. Strassheim, 242 Ill. 359, 90 N.E. 118 (1909). The federal parole statute requires a hearing, 18 U.S.C. § 4207 (1951), as does the statute controlling the revocation of probation. See Escoe v. Zerbst, 295 U.S. 490, 55 S.Ct. 818, 79 L.Ed. 1566 (1935).

Therefore a reevaluation of the validity of the *Fleenor* holding would seem appropriate.

Those courts holding that a hearing is not required base their decisions generally upon one of two grounds: (1) that parole is an act of grace to which the legislature may attach such conditions as it deems advisable [5] and (2) that the parolee has accepted the conditions of his parole, and if one condition of the parole is the possibility of its summary revocation, the parolee cannot complain if that action is taken.

Parole, however, is an integral part of the penalty set for the commission of a crime. That it is an ameliorative part of that penalty should make it no less subject to the constitutional restrictions placed on the legislature's power to define crimes and set the penalty for the commission of them. The granting of a parole is a determination by the Parole Commission that society will be better served by the conditional release of the parolee. With the aid of data from various sources, the Commission has determined that the parolee is a fit candidate for rehabilitation and restoration as a useful member of society. Because of the nature of that determination, the Parole Commission is given a great discretion in reaching its decision to grant or deny a parole; and within the boundaries of that discretion perhaps the granting of a parole could be considered an act of grace of the authority with power.[6]

On the other hand, revocation of a parole is not such a general determination. When released into society, the parolee is given a limited freedom provided that he conform to certain specified conditions.[7] Revocation is a determination that he has not satisfied one or more of those specified conditions. That determination does not allow of so much discretion; and, if reaching that determination without a hearing results in unfairness to the parolee, why should he not have a remedy in the courts?

On that point the second ground resorted to for sustaining the denial of a hearing has some relevance. The so-called "contract theory" developed from an erroneous dictum in United States v. Wilson,[8] 32 U.S. 150, 7 Pet. 150, 8 L.Ed. 640 (1833). The historical and the logical bases of this view were undercut by Mr. Justice Holmes in Biddle v. Perovich, 274 U.S. 480, 47 S.Ct. 664, 71 L.Ed. 1161 (1927), supra. There Perovich sought his release upon the grounds that the commutation of his death sentence to life imprisonment by the President was not

---

5. In relation to pardons, however, Mr. Justice Holmes said in Biddle v. Perovich, 274 U.S. 480, 47 S.Ct. 664, 71 L.Ed. 1161 (1927): "A pardon in our days is not a private act of grace from an individual happening to possess power. It is a part of the Constitutional scheme. When granted it is the determination of the ultimate authority that the public welfare will be better served by inflicting less than what the judgment fixed." at 486, 47 S.Ct. at 665.

6. But see, State ex rel. Joyce v. Strassheim, 242 Ill. 359, 90 N.E. 118 (1909): "But we do not regard his parole as a mere act of grace and favor by the board of pardons * * * We cannot believe that the legislature understood that the board, in establishing rules for parole * * * or exercising the discretion confided to them, would be merely dispensing favors to those whom they might choose to release * * * or that the rearrest * * * should be considered merely a withdrawal of a favor bestowed upon him." 90 N.E. at 121.

7. The report by the President's Commission on Law Enforcement and Administration of Justice phrased the proposition more emphatically: "The offender * * * who is placed on parole * * * is given a guarantee by law that unless he violates certain defined conditions he will not be placed under more severe restriction." at 87, Task Force Report: Corrections (1967).

8. In that case Justice Marshall said that a pardon is a deed or grant that must be accepted by the prisoner before it is effective. He drew this erroneous conclusion from early English cases that had held that the defense of pardon must be pleaded or it is waived. See Weihofen, Revoking Probation, Parole or Pardon without a Hearing, 32 J.Crim.L. & C. 531 (1942); Brief of Appellant in Biddle v. Perovich, 274 U.S. 480, 482–485, 47 S.Ct. 664, 71 L.Ed. 1161 (1927).

accepted by him and, therefore, was not valid. After dispensing with the historical considerations and after enunciating telling arguments against the logic of the view, the Court concluded:

" * * * the public welfare, not his consent, determines what shall be done. * * * The considerations that led to the modification had nothing to do with his will." 274 U.S. at 486–487, 47 S.Ct. at 665.

So a parole is not a "contract" in the traditional sense of that word, and, if the theory only means that the State in fact attached such a condition to the parolee's freedom, the question remains whether the State can attach such a condition. For if the negative pregnant that is implicit in the contract theory is true (that if the parolee had not agreed to summary revocation he would have had the right to a hearing),[9] then that theory has recognized that a right to a hearing is inherent in the revocation situation. Waiver of such a valuable right is not to be lightly determined, and when the "choice" of the parolee is to remain in prison or accept such a burdensome provision, the "choice" to accept parole can hardly be termed a voluntary waiver of the right to a hearing. Therefore, the two legal theories advanced to justify the denial of a hearing have a dubious basis both in history and in logic.

In Fleenor v. Hammond, 116 F.2d 982 (6th Cir. 1941), supra, this Court granted that pardon was a matter of grace but pointed out that once pardoned the person pardoned was entitled to his liberty: a liberty that could be forfeited only by his breach of the conditions of the pardon. As indicated above, the act-of-grace assumption need not be so summarily granted, but, even if the liberty given the parolee is considered a privilege, the *Fleenor* decision is more commensurate with the protection given other so-called privileges by recent Supreme Court decisions. Cf. Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959).

In other areas where the privilege doctrine has been asserted to deny due process considerations, the Supreme Court has strained to find a lack of authority in order to avoid the constitutional issue: In Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), supra, the Court determined that pertinent Executive Orders did not authorize the revocation of the security clearance of an employee of a private corporation without affording him the right to confront and cross-examine the witnesses against him. In Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950), the Court held that deportation proceedings must conform with the procedural requirements of the Administrative Procedure Act, 5 U.S.C. § 1001 et seq. (1946). In Peters v. Hobby, 349 U.S. 331, 75 S.Ct. 790, 99 L.Ed. 1129 (1955), the Court found that the Loyalty Review Board had acted beyond the jurisdiction given it by the pertinent Executive Order. In other cases violations of internal agency regulations made a decision on the constitutional issue unnecessary. Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); (government employees) Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954) (suspension of deportation order). Other times the privilege has been attached to other constitutionally protected freedoms, such as free speech, Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952) (loyalty oaths applied to public teachers), and self-incrimination, Slochower v. Board of Education of New York City, 350 U.S. 551, 76 S.Ct. 637, 1100 L.Ed. 692 (1956) (teacher questioned before Congressional committee).

Conversely, the doctrine of privilege has perhaps played a small part in some decisions. Cf. Jay v. Boyd, 351 U.S. 345, 76 S.Ct. 919, 100 L.Ed. 1242 (1956). But it is significant that in its most recent case concerning revocation of security clearance, Cafeteria and Restau-

---

**9.** That the "contract theory" courts recognized the existence of the negative pregnant gains some cogency when it is observed that if the parolee had no right the contract fiction would be unnecessary.

rant Workers Union Local 473 v. Mc-Elroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L. Ed.2d 1230 (1961), the Supreme Court stated:

"This question cannot be answered by easy assertion that, because she had no constitutional right to be there in the first place she was not deprived of liberty or property by the Superintendent's action. 'One may not have a constitutional right to go to Baghdad, but the Government may not prohibit one from going there unless by means consonant with due process of law.'"

367 U.S. at 894, 81 S.Ct. at 1748.[10] This statement of the proposition accords closely with the assertion made in the *Fleenor* decision that even though a prisoner might not have a constitutional right to a pardon, once pardoned he cannot be deprived of his freedom by means inconsistent with due process.

Although the Court decided in *Cafeteria* that due process did not require a hearing in that case, the language of the opinion seemed to question the efficacy of the doctrine of privilege when its easy assertion is used to permit arbitrary government action. 367 U.S. at 895, n. 8, 81 S.Ct. 1743, 6 L.Ed.2d 1230. The confusion that results from the use of the "privilege-right" dichotomy has been noted in other contexts. Gonzales v. Freeman, 118 U.S.App.D.C. 180, 334 F. 2d 570 (D.C.Cir. 1964). Such confusion is no less apparent when the dichotomy is applied to the status that this Petitioner was enjoying until his summary arrest and incarceration.

In this country most interests of a citizen are protected from direct government action that does not conform to due process of law. Of course, due process has a flexible context; what process is due a person in one situation may not be due him in another, and a cynic might say that if due process has no effect it does not apply. But to say that an in-terest is a privilege; therefore, constitutional rights do not attach only obscures the reasoning by which a decision is reached that due process considerations must yield to policies of countervailing importance. The method of reaching such a decision was indicated in *Cafeteria:*

"As these and other cases make clear, consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." 367 U.S. at 895, 81 S.Ct. at 1748.

The "precise nature of the government function" involved in the revocation of a parole is the determination of an adjudicatory fact: Has the parolee or has he not violated the conditions of his parole? The difficulty arises because all of the functions of administering a parole system are the responsibility of the same agency, which grants parole, supervises parole, and revokes parole. Many of the functions involve a certain amount of expertise in the application of principles of behaviorial and sociological sciences,[11] and some fears have been expressed that judicial interference in one function will disrupt the whole scheme.

For the most part those fears have been supported by nothing more than the untutored intuition of the person expressing them;[12] so they should be closely scrutinized in order to determine their validity. Propositions that would have some cogency under certain circumstances have been magnified into an all-or-nothing attitude that flatly states that requiring a hearing upon revocation of parole would produce dire results on the system: (1) parole boards would become hopelessly mired in needless pro-

10. The quote is from Homer v. Richmond, 110 U.S.App.D.C. 226, 292 F.2d 719, 722 (D.C. Cir. 1961).

11. See Tappan, Crime, Justice, and Correction (1960); Dressler, Practice and Theory of Probation and Parole (1959); Clegg, Probation and Parole (1964).

12. E. g., In re Varner, 166 Ohio St. 347, 16 N.E.2d 731 (1960).

cedure;[13] (2) parole boards would not release deserving prisoners for fear of being unable to return them to prison;[14] (3) informers would be unwilling to testify against a parolee if their testimony would be exposed to confrontation and cross-examination;[15] and (4) the increase in cost would make the program prohibitive.[16] The validity of such fears has come under increasing attack,[17] and experience[18] and expert studies[19] have shown the groundlessness of these views.

We are left then with the argument that a judicial type hearing is inappropriate in the parole revocation situation. It is said that the parole board is as anxious to prove the parolee's innocence as he is; its only interest is to find the truth. Whatever cogency this argument might have if directed against the imposition of the full panoply of criminal procedural safeguards, it has none when

directed against the imposition of a bare hearing. Besides, the limits on the *parens patriae* fiction that have been noted in other areas are just as appropriate here.[20]

So neither the nature of the government function nor fear of disruption of that function can justify the denial of a hearing. If justification can be shown at all, it must be that the "private interest affected" is beyond the pale of the court's protection. But such a view of the Petitioner's status is not supportable. Some courts have attempted to support their "hands-off" policy by a conceptualistic approach to probation, pardon, and parole that does not lend reality to the distinctions drawn. It is said that although a hearing might be required in revocation of a conditional pardon none is required in revocation of parole because a parole does not remit the penal-

13. But see Fleming v. Tate, 81 U.S.App. D.C. 205, 156 F.2d 848 (D.C. Cir. 1946), where the Court, in interpreting a statute to require the allowance of presence of counsel at a revocation hearing, said: "The presence of counsel does not mean that he may take over control of the proceeding." Likewise, in a hearing the parole board is free to adopt procedures consonant with the issue to be resolved. Orderly procedures will more likely aid than impede the decision making process.

14. Michigan requires that almost the full panoply of procedural rights be observed in the revocation of a parole, Mich.Stat. Ann. § 28.2310 (1954), Comp.Laws 1948, § 791.240, P.A.1953, No. 232; yet it has one of the highest rates of parole. Sklar, Law and Practice in Probation and Parole Revocation Hearings, 55 J.Crim.L., Crim. and P.S. 175, N. 157 (1964).

15. The same objection can be made to the requirements of confrontation and cross-examination at criminal trials, and balanced against this possibility is the possibility that malicious lies, baseless rumors, or mistaken impressions might be believed. "Faceless informers are often effective if they need not take the stand." Beard v. Stahr, 370 U.S. 41, 43, 82 S.Ct. 1105, 1106, 8 L.Ed.2d 321 (1962) (Douglas, J., dissenting).

16. But see Warren, Probation in the Federal System of Criminal Justice, 20 Fed. Prob. 3 (1955), where it is indicated that the cost of maintaining a prisoner is

ten times the cost of maintaining a parolee or probationer. Also, in Ohio the cost of maintaining a prisoner is six times the cost of maintaining a parolee or probationer. Annual Report, Ohio Adult Parole Authority 1964/65 at 13–14. The small added expense of a hearing would not make the parole system less attractive economically.

17. See, Tappan, Crimes, Justice, and Correction 739–744; Kadish, Legal Norms and Discretion in the Police and Sentencing Process, 75 Harv.L.Rev. 904 (1962).

18. See footnotes 15–18, supra. Also, such fearful consequences have not occurred in other states where a hearing is required.

19. See 4 Attorney General's Survey on Release Procedures 246–8 (1939); Report by the President's Commission on Law Enforcment and Administration of Justice, Task Force Report: Corrections (1967) [hereinafter Nat'l Crime Comm'n. Report: Corrections].

20. See In re Gault, 387 U.S. 1, 26, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). Also see 4 Attorney General's Survey on Release Procedure 246–7 (1939): "Parole agents are human, and it is possible that friction between the agent and parolee may have influenced the agent's judgment. In fairness to the violator this is a possibility which should be investigated by some higher authority." See footnote 14, supra.

ty.[21] Likewise, a hearing might be required in revocation of probation, though not in revocation of parole, because the suspension of sentence does not complete the judicial process as does sentencing and imprisonment.[22]

By taking this narrow conceptual approach, these courts ignore the essential identity of the position of persons whether they are paroled, put on probation, or conditionally pardoned. Each has been found guilty of a crime; each has been deemed worthy of rehabilitation; and each has been given a status that is considerably more desirable than that of a prisoner. When revocation is threatened, they all have the same interest in maintaining that status.[23]

Other courts have utilized the "technical-custody" theory to analogize the parolee's status to that of a prison "trusty".[24] But even if this analogy is accepted, the courts are increasingly recognizing that no valid social or governmental policy is served by treating a convict as an outcast from society, a person without any rights.[25] And increasingly when a valuable interest of a prisoner is affected by government action, the courts have carefully scrutinized the action to insure that it serves some valid governmental policy or to insure that it comports with due process. For example, a prisoner may sue the government under the Federal Torts Claims Act for the negligence of his custodian, United States v. Muniz, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963), and the prisoner cannot be punished for suing his custodian. Also, this Court has considered issuance of the writ as appropriate to protect a prisoner from the "assaults, cruelties and indignities" of his guards and co-inmates. Coffin v. Reichard, 143 F.2d 443, 155 A.L.R. 143 (6th Cir., 1944). There this Court said, "A prisoner retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law." 143 F.2d at 445.[26]

21. E. g., Owen v. Smith, 89 Neb. 596, 131 N.W. 914 (1911).

22. E. g., Ex Parte Anderson, 191 Ore. 409, 229 P.2d 633, 230 P.2d 770 (1951).

23. Since pardons are rare today, the Nat'l. Crime Comm'n. Report: Corrections concerned itself mainly with probation and parole procedure, and the two correctional processes were considered essentially synonymous since they have the same purpose and effect. On the status of the parolee, the Report noted: "But in any event there is an enormous difference today in the degree of freedom accorded prisoners as against persons on probation or parole."

24. If analogies are deemed necessary, however, the position of the parolee is more analogous to that of an alien who has become a member of the community. No one doubts that due process requires a hearing before such an alien can be expelled from this country. Kaoru Yamataya v. Fisher, 189 U.S. 86, 23 S.Ct. 611, 47 L.Ed. 721 (1903); Kwong Hai Chew v. Colding, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576 (1953). Whereas, the same procedures do not apply to one who has not become a member of the community. United States ex rel. Knauff v. Shaugnessy, 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317 (1950).

25. Nat'l Crime Comm'n. Report: Corrections: "There is necessary doubt as to the propriety of treating this large group of persons as in varying degrees, outcasts from society. And there is necessary recognition that such treatment is not in the ultimate interests of society. Denying offenders any chance to challenge arbitrary assertions of power by correctional officials, and barring them from legitimate opportunities such as employment, are inconsistent with the correctional goal of rehabilitation, which emphasizes the need to instill respect for and willingness to cooperate with society and to help the offender assume the role of a normal citizen." at 82.

See also, Barkin, The Emergence of Correctional Law and The Awareness of the Rights of the Convicted, 45 Neb.L. Rev. 669 (1966); Constitutional Rights of Prisoners: The Developing Law, 110 U.Pa.L.Rev. 985 (1962); Note, Beyond the Ken of the Courts: A Critique of Judicial Refusal to Review the Complaints of Convicts, 72 Yale L.J. 506 (1963).

26. From the Coffin decision, it seems apparent that habeas corpus is the proper remedy in this case. Even if the custody fiction is accepted that court noted: "A prisoner is entitled to the writ of habeas corpus when, though lawfully in custody, he is deprived of some right to

All of these examples contradict the final argument urged for denial of a hearing. That argument contends that the court has afforded the prisoner his due process requirements in his criminal trial, and upon conviction it has pronounced and executed the sentence required by law. So long as the period of the sentence has not run, the argument continues, treatment of the convict, whether it be parole or other, is the sole concern of the legislature and its authorized agency. Long ago in The Federalist, it was said:

"In framing a government which is to be administered by men over men, the great difficulty lies in this: You must first enable the government to control the governed, and in the next place oblige it to control itself. A dependence on the people is, no doubt, the primary control on the government; but experience has taught mankind the necessity of auxiliary precautions."

One auxiliary precaution under our Constitution is that government action that exceptionally affects a person on individual grounds must be effected by procedures that satisfy due process.[27] The courts are entrusted with the high office of determining when that requirement has been met. Parole boards are not free from that restriction; convicts are not deprived of that protection.[28]

In the instant case, the facts, as they must be taken, show that the Petitioner's parole was revoked because he was *accused* of committing a felony, but he was given no opportunity to rebut that accusation. Under these circumstances, the least due process requires is a hearing where the accused can explain his position on the accusation. Moreover, other elements of due process might be required; but, realizing that the government must be enabled to control the governed, the formulating of those procedures can best be entrusted to the agency that must operate under them.[29]

Such a view is not based upon the fear that agencies will act capriciously and arbitrarily if their every action is not scrutinized by the courts. It is based upon the fact that the Commission acted without hearing all of the pertinent evidence that it could reasonably obtain. Such action is itself unfair and capricious when, by allowing a hearing, evidence that is peculiarly within the knowledge of the parolee might shed light on the accusations made against him, or cross-examination might prove the maliciousness of the charges lodged.

In many cases a hearing may be unnecessary. I emphasized that the evidence must be "pertinent" and "reasonably obtainable". When the cause of revocation is that the parolee has been accused, tried, and convicted of a crime committed during the period of his parole, evidence by the parolee to refute that charge would not be pertinent. He had his hearing on the facts at the trial of his case. The inquiry on revocation

---

which he is lawfully entitled even in his confinement, the deprivation of which serves to make his imprisonment more burdensome than the law allows or curtails his liberty to a greater extent than the law permits." 143 F.2d at 445.

27. It seems clear that when administrative action affects a property interest of a person on an individual basis, due process requires that the person be afforded a hearing. Londoner v. City & County of Denver, 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908). Cf. Bi-Metallic Inv. Co. v. State Bd. of Equalization, 239 U.S. 441, 446, 36 S.Ct. 141, 60 L.Ed. 372 (1915).

28. On the power to revoke a parole without a hearing the Nat'l. Crime Comm'n.

Report: Corrections stated: "Yet it is inconsistent with our whole system of government to grant such uncontrolled power to any officials, particularly over the lives of persons."

29. This responsibility to establish standards, however, cannot be avoided by the use of obscure formulations, such as "the parolee violated the conditions of his parole." Fact finding requirements cannot be met by the finding of conclusions. The dangers inherent in such vague standards have been sufficiently indicated. See Cafeteria and Restaurant Workers Union Local 473 v. McElroy, 367 U.S. 886, 900, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961) (Brennan, J., dissenting).

should be "fitted in its range to the needs of the occasion." Escoe v. Zerbst, 295 U.S. 490, 493, 55 S.Ct. 818, 79 L.Ed. 1566 (1935). Just as the strength of accusations of violations will vary in degree from a conviction of crime to conflicting testimony concerning a factual occurrence, so the hearing should be so fitted as to most fairly and most probably reach the truth of the adjudicatory fact in issue.

I would remand the case to the District Court for an evidentiary hearing to determine if the Parole Commission has given the Petitioner a hearing and, if it has, whether that hearing complied with the requirements of due process.