UNITED STATES ex rel. John BEY,
Petitioner-Appellant,

v.

CONNECTICUT STATE BOARD OF
PAROLE, Respondent-Appellee.

No. 817, Docket 35107.

United States Court of Appeals,
Second Circuit.

Argued April 14, 1971.

Decided May 17, 1971.

————◆————

Robert Hermann, New York City (Milton Adler, The Legal Aid Society, New York City, on the brief), for petitioner-appellant.

Stephen J. O'Neill, Asst. Atty. Gen. (Robert K. Killian, Atty. Gen. of Conn., on the brief), for respondent-appellee.

Before WATERMAN, SMITH and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

Nearly a century after its inception as one aspect of a reform movement still widely identified as the "new" penology, the device of releasing prisoners from incarceration on a trial basis as parolees has long since gained common acceptance by the penal systems of every state.[1] Unlike most other Circuits, this court until recently has had little occasion to consider constraints that Fourteenth Amendment guarantees may place on the operation of state parole systems. This appeal, however, requires us for the third time within a year to decide whether an important aspect of a state's parole procedures operates to deprive affected prisoners and parolees of due process of law.

Last term we held in Menechino v. Oswald, 430 F.2d 403 (2d Cir. 1970), that due process did not guarantee legal representation to New York State prisoners when they appeared at a hearing to determine whether they would be released on parole.[2] The instant appeal presents the question, expressly reserved for later decision in *Menechino*, but since decided affirmatively by New York's highest court,[3] whether the Constitution nevertheless requires that parolees be afforded legal assistance at a proceeding to determine whether parole status should be *revoked*. We hold that it does, and that Bey, the petitioner and appellant here, was not accorded due process of law when his parole was revoked and he was reimprisoned following a 1960 hearing before the Connecticut Board of Parole where Bey appeared alone, but was not represented by a lawyer.

I.

An appreciation of the issue presented to us, and our resolution of it, requires a preliminary understanding of the functioning of the Connecticut parole system as it was constituted in 1960. For purposes of deciding this case, the operation of the system is best described with reference to Bey's own history of brief release and subsequent recommitment to prison more than ten years ago, where he has remained confined since.

Pursuant to state law, Conn.Gen.Stat. §§ 54–125, 54–126, appellant was released as a parolee from the Connecticut State Prison on June 10, 1960, where he had been serving a life term for second degree murder. Bey's release was necessarily premised on a finding by the parole board that there was a "reasonable probability that [he would] live and remain at liberty without violating the law and * * * [that his] release [was]

1. It appears that the first parole statute became law in 1877 and thereafter parole rapidly gained favor over its antecedent, the conditional general executive pardon, as part of the progressive movement in penal reform that gave birth to many presently standard correctional tools. See Note, Parole Revocation in the Federal System, 56 Geo.L.J. 705 (1968); Comment, Procedural Safeguards in Federal Parole Revocation Hearings, 57 N.W.U.L. Rev. 737, 740 (1963).

2. The decision in *Menechino* was followed in Lewis v. Rockefeller, 431 F.2d 368

(2d Cir. 1970) (refusing to convene a three-judge court). The other recent case discussing due process in parole processes was United States ex rel. Sperling v. Fitzpatrick, 426 F.2d 1161 (2nd Cir., 1970), holding evidence seized as fruit of an illegal search by state police to be admissible in a revocation hearing.

3. People ex rel. Menechino v. Warden, 27 N.Y.2d 376, 318 N.Y.S.2d 449 (1971) (Fuld, Chief Judge).

not incompatible with the welfare of society." *Id.* § 54–125. The board was required to arrive at this finding only after weighing a complex of factors, many intangible and subjective.[4]

Bey was released from prison in the custody of a parole officer under standard conditions stated on a form signed by Bey prior to his release. The restrictions included a requirement that Bey not "own, possess, use, sell, or have under his control any deadly weapons or firearms," and that he not leave Connecticut without prior permission from a parole board staff member.

The events following Bey's provisional release that resulted eventually in his arrest and reimprisonment less than six months later, on November 30, 1960, are known to us only through a report prepared by a parole officer, Earl C. Mercer,[5] after Bey was arrested and in preparation for his revocation hearing. By Mercer's account, Bey appears to have performed the duties required of him by each of three jobs he held while on parole satisfactorily. He, nevertheless, seemed to progressively disappoint, annoy, and disturb his employers and eventually his parole officer.

During the period of his release, Bey was employed successively in unskilled jobs at the Radiant Baseboard Plant in Newington, the Porter School in Farmington, and the Institution of Living in Hartford, a mental institution, all in Connecticut. In each instance minor difficulties developed shortly after Bey assumed each new job. For example, while he was employed at the Newington plant, Bey's parole officer was required to investigate a report by Bey's landlady that he was engaged in a "sex orgy."

Bey later admitted, according to the parole officer, that a friend had arranged to provide him with a girl with whom to have sexual relations. The landlady entered Bey's room to find him on his bed with the girl, a bottle of whiskey on the floor, and his friend in a nearby chair. The parole officer was disturbed not only over the incident but by Bey's apparent "belligerence" at his landlady's and parole officer's interference with his private affairs. The parole officer was also annoyed at Bey's complaints that his job was unsuitable, that he was receiving inadequate medical treatment for boils and a lame shoulder, and that the services provided him by the parole officer were in other ways inadequate.

At the Porter School, the foreman at the school and the parole officer eventually became "very apprehensive" that Bey was becoming too involved with one of the girl students there, whose ages ranged from 13 to 16 years. The bases for their suspicions are not revealed in Mercer's report. Similarly, while Bey was working as a groundsman at the Institute of Living, his parole officer was told by an official at the Porter School that Bey was writing "upsetting" letters to girls and faculty members at Porter and had become "a little too friendly" with two of the girls. Events began to come to a head when the parole officer learned that, contrary to the officer's instructions, Bey had persisted in talking freely about his prison record, and that Bey sometimes bought whiskey which he took to his room but which others consumed there. Finally, on November 29, Bey's parole officer received a call from an unnamed individual "whose word [was] believed to be reliable by the parole officer," reporting that Bey had threatened to leave Connecticut without informing the parole board, had shown a dagger or knife

---

4. The Board was required to consider, among other things, Bey's attitude toward his crime, his "maturity, stability, sense of responsibility and any apparent development in his personality," his "readiness to assume obligations," his "mental or physical make-up," his "attitude toward law and authority," and his response to efforts made to improve his "mental and moral condition."

5. It is nowhere specified in the record that Mercer was the parole officer who supervised Bey's activities while he was on parole, although that appears to be a reasonable assumption.

to a fellow-employee, and had bragged that he had killed a policeman before and "could kill again if anyone bothered him." A search of Bey's room was conducted the next morning, after Bey had gone to work, by two parole officers and the Assistant Personnel Director at the Institute. A "new English style hunting knife was found in a paper box under some clean clothing on a shelf in Bey's closet," in the words of Mercer's report. Bey was taken into custody and returned to prison later the same day.

Mercer's report, dated December 14, was addressed to the Executive Secretary of the Parole Board, James I. McIlduff. Notably, Mercer considered the knife incident, although a clear violation of a parole condition (see p. 3006 *supra*), "in itself not of tremendous import." Based on Bey's past record, as well as his record on parole, and on "a number of psychiatric evaluations which have been made," Mercer described Bey as "an extremely unstable individual" and "potentially dangerous." According to Mercer, Bey's parole officer had decided that "it is incompatible with the welfare of society that John Bey be continued on parole." Because he considered Bey to be "mentally incapable of accepting the responsibilities of parole," Mercer recommended that he "should not be re-paroled without extensive psychiatric study."

The procedures to be followed after Bey's arrest and return to prison were prescribed by the parole board Regulation "Revocation of Parole." Bey was to have "reasonable notice of the charges against him" and "an opportunity to appear before the parole board at its next regular meeting at the State Prison to admit, deny, or explain the violation charged." After considering the case, the parole board could select any of five options for disposing of Bey's case. Thus, Bey could be reprimanded; his parole might be continued under more stringent conditions, or closer supervision; time previously earned toward reduction of his term of imprisonment could be withheld or withdrawn; and of course, his parole could simply be revoked.

Following a hearing conducted December 21, 1960, at which Bey appeared *pro se*, the Board chose the last, most severe, alternative. As an automatic consequence of parole revocation, Bey was remanded to prison to serve the unexpired portion of the term of his maximum sentence at the date of his violation of a parole condition. Although he could be reconsidered for parole at any time, he would automatically be heard again for possible release on parole only after serving another year of imprisonment. Parole Board Regulation X.C, D. Although Bey's arrest was statutorily authorized for any reason "deem[ed] sufficient" by the parole board, a precondition to parole revocation and reincarceration was that Bey had been arrested "for violation of his parole." Conn.Gen.Stat. § 54–128(a).

At the time it revoked Bey's parole, the board had before it Bey's testimony (there is nothing in the record to indicate the nature of the testimony), Mercer's report, and also a much briefer report prepared by the Executive Secretary, James McIlduff. McIlduff's report consisted of a digest of Mercer's report, in the main stressing aspects least favorable to Bey, and miscellaneous representations based on Bey's previous record. For example, McIlduff described Bey as "emotionally unstable" and "somewhat of an agitator" and referred to a period of several years during Bey's earlier incarceration when Bey was confined at the Norwich State Hospital as a mental patient.

We have recounted the facts revealed in this record with somewhat greater detail than necessary to resolve the legal question presented. We have done so to avoid the appearance of resolving the important issue raised on this appeal abstractly or academically. Bey's brief parole history serves better than hypothesis to illustrate concretely the potential importance of a lawyer's presence at a parole revocation hearing.

At the outset, we must note the narrowness of the issue framed by appellant. In 1967 Bey initiated a habeas corpus action in Connecticut state courts by filing a petition which alleged numerous statutory and constitutional deficiencies in the Board's revocation procedure. The Superior Court, Hartford County, denied the petition, Bey v. Reincke, No. 151663 (July 30, 1969). After an application for a certificate of probable cause was denied, Bey proceeded with his present federal application, again raising numerous constitutional challenges. Judge Blumenfeld denied the petition in all respects in a brief opinion filed June 3, 1970. Among the many constitutional issues resolved against him by the district court judge, Bey has chosen to appeal only the holding that he had no right to counsel at the revocation hearing. That is the sole issue briefed and argued before us and it is the only issue we decide today.

## II.

Precedent on the precise issue before us is conflicting and its significance is difficult to assess. The Tenth Circuit, which has spoken most often and has frequently been followed by other courts, appears to hold that counsel is of sufficient importance that if a parolee is permitted to *retain* counsel to represent him at revocation hearings, then the equal protection and due process guarantees require that counsel also be provided for indigent parolees, Earnest v. Willingham, 406 F.2d 681 (1969), at least when the parolee contests an alleged parole violation, Serviss v. Moseley, 430 F.2d 1287 (1970); Murphy v. Turner, 426 F.2d 422 (1970); but a state may choose to bar counsel from revocation hearings altogether, Firkins v. Colorado, 434 F.2d 1232 (1970) (per curiam); Williams v. Patterson, 389 F.2d 374 (1968). The fount of Tenth Circuit precedent on the latter point seems to be a per curiam opinion in Gonzales v. Patterson, 370 F.2d 94 (1966), relying (as have many courts, including the district court below) on dictum in Escoe v.

Zerbst, 295 U.S. 490, 492–493, 55 S.Ct. 818, 79 L.Ed. 1566 (1935) that *probation* is a matter of "grace."

In Williams v. Dunbar, 377 F.2d 505 (1967), the Ninth Circuit rejected a petitioner's claims to various procedural guarantees at a revocation hearing, including a right to compulsory process to summon witnesses and a right to cross-examine and confront adverse witnesses, as well as a right to counsel. Rather than evaluate the merits of each claimed right individually, the *Dunbar* court reasoned broadly that a state required to comply with *all* the procedures sought would abandon its parole system as rigid and unwieldy. See also Mead v. California Adult Auth., 415 F.2d 767 (9th Cir. 1969) (per curiam) (simply citing Williams v. Patterson, *supra*). On the strength of the Escoe v. Zerbst dictum, *supra* (and relying in part also on its earlier decision in Johnson v. Avery, 382 F.2d 353 (6th Cir. 1967), reversed, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969)), the Sixth Circuit in Rose v. Haskins, 388 F.2d 91, cert. denied, 392 U.S. 946, 88 S.Ct. 2300, 20 L.Ed.2d 1408 (1968) discovered and applied an "axiom" that "the administration of the state's penal system is exclusively a state function under the reserved powers in the Constitution" in finding no right to counsel in state parole revocation proceedings. *Rose* was announced over a scholarly and thorough dissent by Judge Celebrezze, who we believe successfully unravelled the rationale of the majority as well as that of other courts reaching results like that in *Rose,* including those cited above.

The other Circuit to rule on the right to counsel at state parole revocation hearing is the Third. That Court has decided that a state prisoner is not denied due process when revocation is premised on either irrefutable evidence that the parolee violated a condition of his parole, United States ex rel. Halprin v. Parker, 418 F.2d 313, 315 (3d Cir., 1969) (parolee arrested out-of-state; parole revoked because he left the parole board's jurisdiction without permission),

or on a criminal act proved after a full trial prior to parole revocation, United States ex rel. Heacock v. Myers, 367 F. 2d 583 (3d Cir., 1966), affirming on opinion below, 251 F.Supp. 773 (E.D. Pa.), cert. denied sub nom. Heacock v. Rundle, 386 U.S. 925, 87 S.Ct. 900, 17 L.Ed.2d 797 (1967). The Third Circuit has not ruled on the right to counsel where the parole violation is less conclusively established prior to revocation. Finally, in other Circuits the precise question before us here as one of first impression appears not to have been squarely decided, although certain views that have been expressed by the Fourth,[6] Fifth,[7] Seventh,[8] Eighth,[9] and District of Columbia [10] Circuits on closely related issues appear to parallel those of the Circuits which have found no right to counsel at state parole revocation hearings. We note, however, that many of the leading cases in other Circuits were decided prior to the landmark Supreme Court decisions in Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L. Ed.2d 336 (1967) (unanimous) and Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970),[11] discussed below. Our views coincide with those of

6. The vitality of precedent in the Fourth Circuit that there is no right to counsel at least at revocation proceedings where the parolee does not contest that he violated a condition of his parole, see Gaskins v. Kennedy, 350 F.2d 311 (4th Cir. 1965); Jones v. Rivers, 338 F.2d 862, (4th Cir. 1964), has been cast in serious doubt by that Circuit's recent holding that Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967), establishes a right to counsel at every state probation revocation proceeding, regardless of whether an extensive factual inquiry may be expected. Hewett v. North Carolina, 415 F.2d 1316 (4th Cir. 1969). *See* fn. 8, *infra.*

7. The Fifth Circuit has quite recently construed Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967), contrary to the reading given it by the Fourth Circuit, fn. 6, *supra*, as establishing no right to counsel at probation revocation hearings generally because they are a "matter of grace." Shaw v. Henderson, 430 F.2d 1116, 1119 (July 2, 1970).

8. On September 21, 1970, the Eastern District of Wisconsin, in Scarpelli v. Gagnon, 317 F.Supp. 72, construed a recent holding by the Seventh Circuit, Hahn v. Burke, 430 F.2d 100 (1970), which held Mempa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967) to establish a right to counsel in all state probation revocation proceedings, as overruling *sub silentio* earlier authority in the Seventh Circuit that there was no right to appointed counsel in *federal* parole revocation hearings. See Richardson v. Markley, 7th Cir., 339 F.2d 967, cert. denied 382 U.S. 851, 86 S.Ct. 100, 15 L.Ed.2d 90 (1965).

9. In Curtis v. Bennett, 351 F.2d 931 (1965), the Eighth Circuit relied on the theory of the *Escoe* dictum that "parole is a matter of grace" in holding that due process did not require so much as a hearing prior to parole revocation. That court has not departed from its *Curtis* ruling and by a narrow margin (*en banc* 4 to 3) has adhered to *Curtis* on the rationale that "the prisoner has no statutory right * * * to be granted conditional liberty or allowed to remain on parole" and that parole boards would be stifled if they were required to grant parolees "the full panoply of rights accorded in criminal proceedings." Morrissey v. Brewer, 443 F.2d 942 (8th Cir., 1971).

10. A long and influential line of authority in the D. C. Circuit, headed by then Circuit Judge Burger's *en banc* opinion in Hyser v. Reed, 115 U.S.App.D.C. 254, 318 F.2d 225, cert. denied sub nom. Thompson v. United States Board of Parole, 375 U.S. 957, 84 S.Ct. 446, 11 L.Ed.2d 315 (1963), construes the federal parole revocation statute, 18 U.S.C. § 4207, as permitting the parolee to retain counsel but as not requiring the appointment of counsel for indigents. *But see* K. Davis, Administrative Law Treatise, § 7.16 at p. 352 (1970 Supp.) (discounting this aspect of *Hyser* and noting that *Hyser* predates Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)). *Hyser* seems to conflict with the Tenth Circuit holding that indigent federal prisoners are entitled to appointed counsel so long as retained counsel is permitted, at least where the parolee contests an alleged violation of parole. Serviss v. Moseley, 430 F.2d 1287 (10th Cir. 1970). *See also* Comment, Procedural Safeguards in Federal Parole Revocation Hearings, 57 N.W. U.L.Rev. 737, 758–60 (1963).

11. As we have said, most of the precedent in other circuits which we have cited, on the same or on closely related issues, was

courts in Pennsylvania, Michigan and New York, Commonwealth v. Tinson, 433 Pa. 328, 249 A.2d 549 (1969); Warren v. Michigan Parole Board, 23 Mich. App. 754, 179 N.W.2d 664 (Ct.App. 1970), appeal dismissed, Mich., 184 N.W.2d 457 (1971); People ex rel. Menechino v. Warden, 27 N.Y.2d 376, 318 N.Y.S.2d 449 (1970) and one federal district court, Goolsby v. Gagnon, Civ.No. 70–C–330, 322 F.Supp. 460 (E.D.Wis. 1971), and with the recommendations of several scholars and commentators who have long urged courts to recognize that legal assistance is essential to the fundamental fairness of a parole revocation proceeding.[12]

### III.

In particular, we are in accord with those who consider it no longer tenable to rely unanalytically on dictum in the Supreme Court's 1935 case, Escoe v. Zerbst, *supra,* in a probation revocation case, that "[p]robation or suspension of sentence comes as an act of grace to one convicted of a crime, and may be coupled with such conditions in respect of its duration as Congress may impose." 295 U.S. at 492–493, 55 S.Ct. at 819. It seems often to be overlooked that the primary thrust of *Escoe* was to stress the importance of the hearing guaranteed by statute prior to revocation of federal probation. Moreover, as authority for the quoted dictum, the Court in Escoe cited Burns v. United States, 287 U.S. 216, 53 S.Ct. 154, 77 L.Ed. 266 (1932), where it had stated a principle complementary to the *Escoe* dictum and harmonious with our own views, that "[w]hile probation is a matter of grace, the probationer is entitled to fair treatment, and is not to be made the victim of whim or caprice." *Id.* at 223, 53 S.Ct. at 156.

Any lingering doubt that the "grace" theory of *Escoe* may no longer be resurrected as the Q.E.D. of due process arguments on the question presently before us should have been finally laid to

established prior to *Mempa.* The Third Circuit holds only that no counsel is required at parole revocation proceedings where the parolee does not or cannot contest the fact that he violated a condition of parole. In no Circuits but the Fifth and Eighth has precedent contrary to our decision today been reassessed following of Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), a case which undermines the rationale of the leading Ninth and Tenth Circuit cases, based on dictum in Escoe v. Zerbst, that there is no right to counsel in parole revocation proceedings because parole is a matter of "grace." The Fifth Circuit decision, Shaw v. Henderson, 430 F.2d 1116, 1119 (1970), itself relies on the "grace" theory and does not cite *Goldberg*, which was decided only four months before *Shaw* was announced.

12. Standards approved by the House of Delegates of the American Bar Association in February, 1966, recommended that counsel be provided in connection with both probation and parole revocation proceedings. See ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Providing Defense Services 68 (1967). The ABA Project on Minimum Standards of Criminal Justice, Standards Relating to Probation § 5.4(a) (ii) (Approved Draft, 1970) recommends counsel at all probation revocation hearings. The ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Providing Defense Services § 4.2 (Approved Draft, 1968) would require that counsel be provided in all post-conviction proceedings "which are adversary in nature." Both the President's Commission on Law Enforcement and the Administration of Justice, Report: The Challenge of Crime in a Free Society 150 (1967) and its task force reports on The Courts 54 (1967) and Corrections 86–88 (1967), recommend that counsel be provided for probation and parole revocation hearings. The American Law Institute, Model Penal Code § 305.15(1) (Proposed Official Draft 1962) provides that a parolee "shall be permitted to advise with his own legal counsel" in preparing for parole revocation hearings. See also, *id.* § 301.4 (right "to be represented by counsel" at *probation revocation* hearings). *See* W. Cohen, Due Process, Equal Protection and State Parole Revocation Hearings, 42 U.Colo.L.Rev. 197 (1970); Note, Constitutional Law, Parole Status and the Privilege Concept, 1969 Duke L.J. 139; Note, Parole Revocation in the Federal System, 56 Geo.L.J. 705, 719–26 (1968). Cf. Comment, Freedom and Rehabilitation in Parole Revocation Hearings, 72 Yale L.J. 368 (1962).

rest by the explicit direction of Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), that a constitutional challenge to procedures preceding a state's withdrawal of welfare benefits "cannot be answered by an argument that public assistance benefits are a 'privilege' and not a 'right.'" *Id.* at 262, 90 S.Ct. at 1017. In this Circuit, early conceptual analysis has yielded to practical consideration of "the nature of the governmental function involved and the substance of the private interest which is affected." Escalera v. New York Housing Auth., 2nd Cir., 425 F.2d 853, 861, cert. denied, 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970). "[S]tates may not avoid the rigors of due process by labelling an action which has serious and onerous consequences as a withdrawal of a 'privilege' rather than a 'right.'" Sostre v. McGinnis, 442 F. 2d 178, 196 (2d Cir. 1971) (en banc). See also, Securities & Exchange Comm'n v. Frank, 388 F.2d 486, 492 (2d Cir. 1968); K. Davis, Administrative Law Treatise § 7.04 (1970 Supp.).

█ We do not imply by this that it is irrelevant that appellant is a lawfully convicted felon, a fact permitting the constriction of freedoms guaranteed other citizens so far as "justified by the considerations underlying our penal system" Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). Moreover, we are cognizant that insensitive judicial intrusions might blunt the flexibility of a useful device such as parole, which may permit both a smoother transition from the dependency of prison to complete freedom and earlier release from incarceration under conditions designed to test the prisoner's capacity to "make it on the outside."

Accordingly, we have refused to shackle a parole board in its endeavor to dispose of each parolee's case on an individual basis by denying it access to relevant information produced by an illegal state police search. United States ex rel. Sperling v. Fitzpatrick, 426 F.2d 1161 (2nd Cir., 1970). For similar reasons we declined in Sostre v. McGinnis 442 F.2d 178 (1971) to import the trappings of trial-type due process into prison disciplinary proceedings. Most closely in point to this case, however, is our holding in Menechino v. Oswald, *supra*, that a prisoner "is not entitled to procedural due process," including legal representation, "in seeking parole." 430 F.2d at 408–409.

But the respondent here misconstrues the relevance of *Menechino*. That case does not dictate that parolees facing loss of their conditional freedom be equated with prisoners looking forward to release. It does, however, provide a convenient model for analysis. Patterning our discussion on Judge Mansfield's majority opinion in *Menechino*, we will consider in turn three factors: (1) Bey's stake in the parole revocation proceeding; (2) the importance to the fairness of the proceeding of the particular constitutional right asserted; and (3) the anticipatable effects on state institutions of recognizing that right. See Hannah v. Larche, 363 U.S. 420, 444, 80 S.Ct. 1502, 1515, 4 L.Ed.2d 1307 (1960) ("The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account"). *Menechino's* parole release case is sharply distinguishable from the present parole revocation case on each count.

## A. *The Parolee's Interest in Conditional Freedom*

Unlike a prisoner being considered for parole release, a parolee facing reimprisonment stands to lose a "presently enjoyed" interest in his conditional freedom that the *Menechino* panel aptly characterized as "a liberty akin to a private interest." 430 F.2d at 409. It is not sophistic to attach greater importance to a person's justifiable reliance in maintaining his conditional freedom so long as he abides by the conditions of his release, than to his mere anticipation or hope of freedom. In this respect, this case is indistinguishable from Mem-

pa v. Rhay, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967), establishing the right to legal representation at Washington State's unusual deferred sentencing and probation revocation proceeding. Both the probationer and parolee have "been given a status that is considerably more desirable than that of a prisoner. When revocation is threatened, they all have the same interest in maintaining that status." Rose v. Haskins, 388 F.2d 91, 103 (6th Cir. 1968) (Celebrezze, J., dissenting). The cost to Bey of revocation thus far has been eleven years of imprisonment.

■ Moreover, we do not doubt that a parole revocation is more likely than a denial of initial release to mar a prisoner's record, perhaps adversely affecting his chances for future parole. Even after release from prison, it is only realistic to assume that a former inmate's job opportunities and standing in the community will also be influenced by his prison record. Parole revocation will inevitably connote wrongdoing and thus the citizen whose parole was once revoked will continue to carry a burden analogous and in addition to his criminal stigma. See Hahn v. Burke, 430 F. 2d 100, 102 (7th Cir. 1970). Thus, it seems incontestable to say that "substantial rights" of Bey were "affected" by the revocation proceeding. For that reason as well as those stated below, Bey was entitled to the assistance of a lawyer. Mempa v. Rhay, 389 U.S. 128, 134, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967).

B. *The Lawyer's Role in a Parole Revocation Proceeding*

A decision to revoke parole, like a parole release determination, inevitably involves the discretionary application of principles and knowledge derived from study and experience in fields such as psychology, sociology, and penology—where ordinarily a lawyer can claim no special expertise. Neither forensic skill, legal training, nor the advocate's role in a decision making process suits a lawyer for effective participation in this judgment phase of the parole process. Un-

like a parole release decision, however, a necessary precondition to parole revocation is a finding that events intervening between a prisoner's release and the hearing justify forfeiture of the prisoner's provisional liberty. Thus, in Connecticut, the parole release decision is based on a complex of tangible and intangible, objective and subjective, factors which we have partly enumerated above. See fn. 4, *supra*. By contrast, a necessary precondition to Bey's reincarceration was the finding that Bey had violated a condition of his parole. Whether Bey would lose his conditioned liberty turned on a narrow retrospective determination of a specific factual question. A lawyer's training particularly suits him to analyze and organize for the benefit of an impartial tribunal evidentiary matter bearing on the occurrence or nonoccurrence, as well as the significance, of past events. See Specht v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967).

Of course, more complex factual questions than whether Bey had a knife in his closet and why, were also relevant to the disposition of his case by the parole board. Mercer's report reveals the complexity of factual questions that can dispose a parole board or officer to greater or lesser leniency or harshness. None of the incidents that soured Bey's relationship with the parole officer are sharply delineated by Mercer's recitation. McIlduff apparently accepted Mercer's account at face value. A trained lawyer might well have discovered mitigating circumstances and hidden significances not revealed or immediately obvious on the face of Mercer's report. For example, the Board might well have welcomed a suggestion for a fuller investigation of Bey's alleged announced intent to depart the state, or his oblique threat to repeat his past crimes. Perhaps Bey's employers could have supplied useful information as to Bey's dependability and thoroughness on the job. A review of Bey's reported letters to Porter School girl students might have revealed different

hues of motivation than found their way into Mercer's report.

Thus, at the least a diligent lawyer representing Bey before the Parole Board might have investigated the decisive events of Bey's brief period of release and in an orderly, disciplined presentation to the Board have attempted to establish facts more favorable to Bey than those presented by Mercer and McIlduff and have suggested their relevance to the four alternatives less severe than revocation available to the Board in disposing of Bey's case, see p. 3008, *supra*. See Townsend v. Burke, 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948); McConnell v. Rhay, 373 U.S. 2, 89 S.Ct. 32, 21 L.Ed.2d 2 (1968) (per curiam). See also, Cohen, Sentencing, Probation and the Rehabilitative Ideal: The View from Mempa v. Rhay, 47 Tex. L.Rev. 1, 28 (1968).

■ The fact that the Board performs a predictive and prognostic function does not depreciate the importance of accurate factual exposition and evaluation. Less educated or intelligent prisoners are particularly likely to suffer from the absence of trained legal assistance. See Johnson v. Avery, *supra*. Bey himself must have been severely handicapped in preparing a case from behind prison walls.[13] Cf. Sostre v. McGinnis, *supra*, 442 F.2d at 196–197. Accordingly, we are compelled to recognize, as did the Court in Mempa v. Rhay, 389 U.S. 128, 135, 88 S.Ct. 254, 256, 19 L. Ed.2d 336 (1967), "the necessity for the aid of counsel in marshalling the facts, introducing evidence of mitigating circumstances and in general aiding and assisting the defendant to present his case."

C. *Impact of a Right to Counsel on the State's Parole System*

■■ We realize that "the due-process clause should not be treated as a de-

vice for freezing the evidential procedure of [state correctional processes] in the mold of trial procedure." Williams v. New York, 337 U.S. 241, 251, 69 S.Ct. 1079, 1085, 93 L.Ed. 1337 (1948) (sentencing). But the state has demonstrated no respect in which the presence of counsel for the limited purpose of developing and evaluating relevant events of a parolee's history on parole, and of recommending alternative dispositions to revocation, will tend to inhibit or constrict the parole process. Indeed, representation of parolees at revocation hearings should advance, not retard, the "modern concept of individualized punishment" and rehabilitation. Williams v. New York, *supra*, 337 U.S. at 247, 69 S.Ct. at 1083. As distinct from other elements of trial-type due process, see U. S. ex rel. Sperling v. Fitzpatrick, *supra*, a lawyer's participation should not be permitted to impede the flow of relevant information to the parole board. Indeed, competent counsel should augment the flow and the board, as well as the parolee, should benefit from a trained lawyer's capacity to guard against error and distortions. To the extent that a lawyer who misconceives his role in the parole process might resort to dilatory or distracting tactics or equate it with his role in the trial of a case, the board does not lack the power to so structure the proceedings as to maximize the lawyer's contribution and minimize his potential for disruption. See Fleming v. Tate, 81 U.S.App.D.C. 205, 156 F.2d 848, 849–850 (1946).

■ Nor does our decision threaten to introduce friction into the relationship between a parolee and his assigned parole officer. The right to counsel does not attach until the parole status might imminently be discontinued. Neither will counsel's participation in proceedings post-dating a parolee's arrest and incarceration pending his hearing

---

13. The disadvantages resulting to one who without counsel is incarcerated in a *revocation* proceeding are magnified as compared with a parole *release* determination, *see* Menechino v. Oswald, *supra*, for in the revocation proceeding the board's decision, as was the case here, may be premised on questions of fact as to particular events which occurred beyond prison walls.

add in any degree to the burden of the overworked parole officer, or require him to divert his energies from his "rehabilitative" to his "patrolman" functions.[14] See United States ex rel. Sperling v. Fitzpatrick, 426 F.2d 1161, 1164 (2d Cir. 1961) (Lumbard, Chief Judge, concurring).[15]

We believe also that, unlike perhaps a decision that would have been contrary to that announced in Menechino v. Oswald, *supra,* recognizing a parolee's limited right to counsel will have little or no tendency to defeat its own purpose by causing Connecticut to grant fewer paroles. No such effect has to our knowledge ever been demonstrated. See Sklar, Law and Practice in Probation and Parole Revocation Hearings, 55 J. Crim.L.C. & P.S. 174, 175 (1964); *id.* 194 n. 157 (Michigan, which guarantees parolees by statute almost the full panoply of due process rights, had one of the highest rates of parole in the country). It is contrary to common sense that state policy would be significantly influenced by the relatively small increased administrative burden ensuing from legal representation to parolees at revocation hearings.

Chief Justice Burger has recently commented on the seeming effectiveness with which "typical" prison systems in this country "brutalize and dehumanize" inmates. Interview with Chief Justice Burger, U. S. News & World Rep., Dec. 14, 1970, p. 45. One certain way to increase a prisoner's sense of resentment and to discourage his will eventually to return to a normal life would be to deny him basic safeguards essential to the fundamental fairness of a decision to deprive him of the liberty he gained upon parole release.

## IV.

For the reasons stated, we hold that parolees are entitled to legal representation at parole revocation hearings that may result in their reincarceration.

■■ We stress once again that the participation of the lawyer at a parole hearing should be limited to investigating and explicating to the board, evidence bearing on the occurrence or nonoccurrence of events during the parolee's period of release and their significance, provided these are relevant to the disposition of the prisoner's case. Counsel should not be permitted to employ trial tactics utilized in an adversary context. For example, he should not employ as his forensic text the parolee's entire life history prior to his release on parole. Nor is it counsel's function by cajolery or blandishment or oratory to interfere with the Board's judgment in applying its special expertise to the facts of the case at hand. We emphatically stress that our decision does not detract in the least from the Board's power to limit counsel's participation in revocation proceedings so that parole hearings do not become legal battles. Counsel's proper role is to *assist* the Board, not to impede it, and the Board may take appropriate measures to assure that the counsel appreciates his limited role and presents his client's case accordingly.

■ Appellant has suggested that the lapse of time and resultant staleness of the evidence bearing on Bey's revocation require that we summarily order his release from prison. But there is no presumption that the Board's initial disposition of Bey's case was erroneous and we will remand the case to the district court for entry of the conditional order usually appropriate in this situation.

14. Petitioner has not challenged the procedures by which Connecticut returns parolees to prison pending their revocation hearings. Our decision does not cast doubt upon the constitutional adequacy of those procedures.

15. Professor Kenneth C. Davis, Administrative Law Treatise § 7.16, at 356–59 (1970 Supp.), recommends essentially the same flexible approach to counsel's role in parole revocation proceedings as we adopt today, comparing it in particular to German civil procedure where the presiding officer is in "full control" and the role of counsel reduced: "Fact-finding processes can be summary or quick without being basically unfair." *Id.* at 258.

Bey must be given a new revocation hearing with participation by counsel within the bounds we have defined. He will be released only if such a hearing is not conducted within a reasonable time.

Reversed and remanded.